**ITHACA INDUSTRIES, INC., a corporation, Plaintiff,**

v.

**ESSENCE COMMUNICATIONS, INC., a corporation, and Essence Direct Mail Marketing Corp., a corporation, Defendants.**

No. ST-C-83-242.

United States District Court, W.D. North Carolina, Statesville Division.

June 23, 1986.

Judgment Sept. 4, 1986.

Susan F. Olive, Olive and Olive, Durham, N.C., for plaintiff.

George L. Little, Jr., Winston–Salem, N.C., Steven D. Hoffman, New York City, for defendants.

## MEMORANDUM OF DECISION

WOODROW WILSON JONES, District Judge.

The Plaintiff, Ithaca Industries, Inc. (Ithaca), a Delaware corporation with its principal place of business in the Western District of North Carolina at North Wilkesboro brought this action against the Defendants, Essence Communications, Inc. (ECI) and Essence Direct Mail Marketing Corporation (EDMM), Delaware corporations with their principal place of business in

New York City, New York seeking a declaratory judgment of trademark invalidity and noninfringement. The Defendants counterclaim for injunctive and compensatory relief for alleged infringement of their trademarks. Pendent claims assert and deny unfair competition and unfair trade practices under North Carolina and New York state laws and the common law.

The action is brought under the provisions of the Trademark Laws of the United States, 15 U.S.C.A. Section 1051 et seq. with the pendent claims being asserted under North Carolina General Statute 75–1.1; *et seq.*; New York General Business Law Section 368–d and the common law. Jurisdiction is invoked under 28 U.S.C.A. Sections 1331 and 2201–02.

The Court heard the case at the April term in Statesville, North Carolina and after full consideration of the pleadings, stipulations, evidence, briefs and arguments now enters its findings and conclusions:

Ithaca is a textile company with headquarters and a plant located in North Wilkesboro, North Carolina and specializes in the manufacture of hosiery and underwear. The company purchased the Anderson Hosiery Division of Collins & Aikman Corporation in January, 1982 and as a part of those assets acquired the SHEER ESSENCE brand of pantyhose. Collins & Aikman made its first shipment of SHEER ESSENCE pantyhose in April 1981 and filed an application to register the mark on May 29, 1981, which application was assigned to Ithaca at the time of the transfer of the other assets of Anderson Hosiery Division. Ithaca continued the production of the SHEER ESSENCE pantyhose line which Collins & Aikman had begun and continues to manufacture and sell the line to date.

ECI is the owner of United States Trademark Registration No. 1,131,774 ('774) issued March 11, 1980 for the mark ESSENCE used for "a magazine concerning matters of general interest to women." ECI is also the owner of United States Trademark Registration No. 1,204,615 ('615) issued August 10, 1982, for the mark ESSENCE used for "clothing—namely, T-

shirts." The other Defendant, EDMM, a wholly owned subsidiary of ECI, had issued to it on April 26, 1983, United States Registration No. 1,235,902 ('902), for a mark ESSENCE STYLE used for "retail mail order services for women's clothing and accessories, jewelry and home furnishing accessories." On May 20, 1985, EDMM assigned the ownership of the ESSENCE STYLE registration to ECI. The first use of the word ESSENCE was made by ECI on April 14, 1970 as the title of a magazine and it used the word printed on the front of T-shirts in June 1977. EDMM published one testmarket issue of a retail mail order catalog under the title ESSENCE STYLE in 1980.

On July 8, August 16, and September 20, 1983, ECI and EDMM, through counsel, wrote Ithaca demanding that it cease and desist from use of the trademark SHEER ESSENCE in connection with the production and sale of pantyhose, contending that such use infringed their rights in the mark ESSENCE. In addition ECI on August 19, 1983 filed a trademark opposition in an effort to block Ithaca from obtaining federal registration of its SHEER ESSENCE mark. Ithaca filed this declaratory judgment action on October 4, 1983 and the parties moved to suspend the Trademark Office proceedings pending the outcome of this case.

Ithaca contends that Defendants' Registration No. '615 for the mark ESSENCE for "clothing—namely T-shirts" and their Registration No. '902 for the mark ESSENCE STYLE for "retail mail order services for women's clothing and accessories, jewelry and home furnishing accessories," are invalid; that their prior rights in the mark ESSENCE are limited to the publishing field and that they have no right to prevent the Plaintiff from using the mark SHEER ESSENCE for pantyhose. The Plaintiff further contends that in any event the Defendants' failure to assert their marks in a speedy fashion, and acquiesce in the existence of numerous third party uses of the word ESSENCE as a trademark, bars enforcement of any alleged rights in the mark against it, and that Defendants'

attempt to enforce their alleged rights to the word ESSENCE amount to unfair competition and antitrust violations.

The Plaintiff seeks a court order declaring that United States Registration Nos. '615 and '902 are invalid; that it declare those registrations as well as Registration No. '774 and any common law or state law rights of the Defendants in the mark ESSENCE to be not infringed by Ithaca's use of SHEER ESSENCE for pantyhose; that it declare all of Defendants' rights in the mark to be unenforceable with respect to the Plaintiff; that it order ECI to dismiss a pending trademark opposition to the issuance of Plaintiff's application for its SHEER ESSENCE mark for pantyhose and award the Plaintiff its costs including attorney's fees.

The Defendants claim and contend that Ithaca's use of the mark SHEER ESSENCE for pantyhose infringes their rights under the Registration Marks Nos. '744, '615 and '902 and under state statutes and the common law.

The Defendants request the Court to find that the Plaintiff's use of SHEER ESSENCE for pantyhose infringes their rights in their mark ESSENCE and seek to enjoin the Plaintiff from further use of the mark SHEER ESSENCE or any mark confusingly similar to ESSENCE, and award them in a separate trial the full amount of damages caused by such infringement as measured by the Plaintiff's profits. The Defendants also request the Court to treble the damages assessed and award them their costs and attorneys' fees on account of the alleged willful nature of the infringement.

ECI began its use of the word ESSENCE as its trademark in commerce on April 14, 1970 with its first issue of *Essence Magazine* and the use has continue to date without interruption. While the trademark, issued on March 11, 1980, indicates that it was a magazine concerning matters of general interest to women the evidence shows that it is only concerned with matters of general or special interest to black women. The magazine is identified not only by its name *Essence* but also by a design mark depicting a black woman's head with braids. It has grown into a nationally known and successful publication with a circulation of over 800,000. Its advertising revenues reached twelve million dollars in 1985. The magazine is sold in newsstands, in supermarkets, drugstores, convenience stores and is delivered by mail to homes across the country. The evidence tended to show that its readers are primarily black women between the ages of 18 and 49. The largest concentration of its readers and sales are in the southeastern states.

In 1979, Anderson Hosiery manufactured sheer hosiery and sold them primarily through supermarkets and variety stores, such as Roses, Winn–Dixie and TG & Y. At that time some of the hosiery was sold under "private labels," meaning that the hosiery bore a brand name owned by the store in which the goods were sold. In addition other hosiery bore "controlled labels," meaning that Anderson Hosiery owned the brand name and could market the product through a number of different outlets. In mid–1979, Anderson Hosiery became interested in selling pantyhose to the ethnic segments of the marketplace. Studies showed that black women were heavy consumers of pantyhose and there was a need for more colors and sizes than black women could find in retail outlets at that time. The studies revealed that there was a potential market for a pantyhose product aimed at women of darker skin tones, primarily Hispanics and Blacks.

Anderson Hosiery developed a pantyhose for this potential market and designated it SHEER ACCLAIM and began an advertisement campaign to sell the line. Advertisements were placed in newspapers in California where the test market in Hispanic stores had proven successful and in ethnic magazines in the east including *Essence* magazine. The evidence showed that Anderson was a leader in the industry with reference to the manufacture of ultra-sheer pantyhose, made of monofilament yarns. Its experience in the marketplace and the studies and tests revealed that such ultra-sheer pantyhose were very appealing to ethnic women. Since Anderson was using

the name SHEER ACCLAIM on other goods sold at retail the decision was made to seek and find a new name for the newly developed ultra-sheer pantyhose for ethnic women.

In selecting a name for the new product Anderson followed its usual practice of receiving suggestions from a number of its employees involved in the production and marketing of such product. James Roberts had been employed to handle sales of the product. He was directed to coordinate the efforts to find a suitable name. He collected and wrote down the following suggested names, SHEER PERFORMANCE; SHEER ESSENCE; SHEER ILLUSION; SHEER 'N SILK; SHEER SILKIENCE, and others. After the name SHEER ESSENCE was selected the evidence shows that Anderson followed its standard practice with respect to proposed product names. This procedure required that a check be made of the *Trademark Register* for the clothing class, a copy of which was kept at the plant in Clinton, South Carolina and if no conflict was apparent the name be submitted to house counsel and then to its outside trademark counsel.

On or about April 13, 1981, Anderson Hosiery received a report from its trademark counsel, Paul & Paul, Philadelphia, Pennsylvania relative to the use of SHEER ESSENCE in the sale of pantyhose. Counsel reported that a prior federal trademark registration of the mark ESSENCE had been issued in 1973 to Joseph Bancroft & Company and had been assigned to J.P. Stevens Company. No affidavit of continued use had been filed and the registration had been cancelled in 1980. Counsel further reported that an application to register the mark ESSENCE was filed in 1978 during the time when the Stevens registration of ESSENCE for pantyhose was still a subsisting registration and the application had been abandoned. Counsel advised that in the event neither J.P. Stevens nor the second applicant was continuing to use the mark ESSENCE for pantyhose then it would be appropriate to adopt the mark SHEER ESSENCE and use it, after which an application for trademark registration could be filed.

Further checks revealed no use of the trademark ESSENCE for pantyhose and Anderson prepared several packages of pantyhose upon which was embossed the name of SHEER ESSENCE and six of the packages were shipped to a customer in Florida for purposes of establishing the interstate use necessary for the filing of an application for trademark registration. Similar packages were sent to counsel with instructions to prepare for filing an application for trademark registration. The application was filed in the United States Trademark Office on May 29, 1981.

During the latter part of 1981, while work was continuing on the production and marketing of the new product, SHEER ESSENCE pantyhose the Plaintiff, Ithaca purchased the Anderson Hosiery Division from Collins & Ackman. Mr. Spruill resigned as president of Anderson Hosiery and became president of Chic Hosiery, one of Ithaca's competitors. Mr. Roberts' services were terminated and Mr. Waller was retained and put in charge of marketing the new pantyhose. Mr. Waller terminated the arrangements with outside marketing groups and decided to rely upon the company's experience in marketing pantyhose. He made changes in the proposed package of the pantyhose by increasing the prominency of the descriptive references to SUPER SHEER pantyhose so that these words became larger and more prominent than the brand name which was moved to the upper left side of the package. On the reverse side of the package the following words were printed: "If your skin is anywhere between apricot and ebony, SHEER ESSENCE pantyhose is Especially for you," in an apparent effort to appeal to both Hispanic and Black women.

Large shipments of this product were made on May 19, 1982 and Ithaca has continued to produce, ship and sell SHEER ESSENCE pantyhose, using the same markets which it has used over the years to sell its pantyhose products. These markets have been concentrated in the southeastern and southwestern parts of the country. Product promotions used for the line include both the packaging itself as well as

special graphics on the in-store displays and various promotional dollar allowances to retailers. The retailers then select their own advertising media for the product. The package contains the model of a dark-skinned female of the Diana Ross type.

The evidence shows that no incident of confusion or alleged confusion between SHEER ESSENCE pantyhose and the products of any other company have ever been made known to Anderson Hosiery except the letters from the Defendants and a complaint from Consolidated Food Corporation that the trademark was confusingly similar to Consolidated's trademark SHEER ELEGANCE for pantyhose.

The record shows that the United States Patent and Trademark Office determined that there was no likelihood of confusion between the mark SHEER ESSENCE, used on pantyhose, and any other registered mark, except Bancroft's ESSENCE registration for pantyhose, which developed to have been cancelled and passed Ithaca's application for publication on June 21, 1983. At the time this determination was made there was of record Defendants' Registration ('774) for ESSENCE for a magazine and ('615) for ESSENCE for T–Shirts.

*Defendants' Use of ESSENCE Marks*

A small group of black men formed The Hollingsworth Group in 1969 and decided to publish a magazine directed to black women. Originally the magazine was to be called "Sapphire" after the female character in the Amos and Andy radio show but objections were made and they changed the name to "Essence." While counsel for Defendants contend the name "Essence" was arbitrarily chosen the evidence indicates otherwise. The dictionary defines the meaning of essence as "that which makes something what it is; intrinsic, fundamental nature of something; essential being or true substance." The gist of the testimony and prior statements of the officers and founders of the magazine indicate the name "Essence" was selected because it suggested an inner quality or inner force of black women.

The magazine is identified both by its registered ESSENCE word mark and by a design mark depicting a black woman's head with braids. ECI has obtained a Trademark Registration for its head with braids design mark as a trademark of its magazine.

The first issue of the magazine appeared in May 1970 and an issue has been published each month since that time. The first issue consisted of 50,000 copies and it has continued to grow each year reaching 800,-000 copies in 1985. It is sold by mail and in approximately 30,000 drug stores, variety stores, supermarkets and newsstands throughout the country. From its meager beginning it has grown into a multi-million dollar business.

ECI has devoted much time and money to the promotion of its magazine in an effort to persuade individuals to purchase or retain subscriptions and to persuade business firms to buy space to sell their products. It is advertised in numerous trade publications and through promotional films or video tapes and mailers and brochures in an effort to sell space and subscriptions. While the exact amount spent on promotion cannot be determined from the evidence it is clear that the figure would be in the millions of dollars over the life of the magazine. The magazine has come to be accepted by financial institutions, advertisers and its readers.

In the trademark registration the magazine is described as "a magazine concerning matters of general interest to women." Despite this broad language the Defendants correctly portrayed the magazine as being aimed at the submarket of black women. Susan L. Taylor, editor of the magazine described it in terms of its contents as a "full service life style magazine targeted to black women." It attempts to provide information on anything, and everything, which may be of interest and assistance to black women. The advertisements used to promote the magazine portray it as a vehicle for travel services, cosmetics, fragrances, hair care, personal care products, home furnishings, automobiles, electronics, including stereo record and tape players, fashions, distilled spirits, wine and food items.

Neither the advertisements carried in the magazine nor the editorial content is limited to the world of fashion. The president of the company testified that fashion advertisement represents only five per cent of the total revenues from advertisement.

The evidence shows that ECI has established a very successful and profitable national full service life style magazine targeted to black women. In all of the promotion and advertisement it has established that the word ESSENCE has come to be identified with the magazine in the field of black women's service magazines. However, the evidence does not establish that the word ESSENCE has come to be recognized as exclusively associated with ESSENCE magazine in all fields, or, in particular, the pantyhose field which is the subject of this lawsuit. Nevertheless, ECI contends that its activities in other fields establish that it not only intended to "bridge the gap" between the field of the magazine, and the field of pantyhose, but that the gap was indeed already bridged prior to the time Anderson Hosiery began using the mark SHEER ESSENCE for its pantyhose. The Court must examine such activity.

ECI relies upon its registration of the mark ESSENCE for clothing—namely, T-shirts, issued on August 10, 1982, among other things, to support this contention. The T–shirts which form the basis of the registration and claims to rights in the mark for clothing were manufactured by others and then emblazoned with ESSENCE magazine's name and the logo design of a black woman's head with braids on the left breast. Shirts bearing the same adornments had been distributed to advertisers, free of charge, as promotional items, in the past, along with other items such as tennis racket covers, pads of paper, etc. The evidence shows that all of these items had but one purpose, that is, to advertise the magazine.

Later an effort was made through the magazine to sell the T-shirts to the readers. The vice-president who was in charge of T-shirt sales testified that he hoped readers would buy them in order to identify themselves with the magazine. Still later an effort was made to sell T-shirts through the mail order catalog in 1980. They were never sold or offered for sale through the regular channels of trade in competition with other T-shirts on the market. The vice-president testified that the last printing of the T–shirt occurred in 1978 or 1979 because the design, meaning the printing on the shirt, and the style had become obsolete. The printing to which he referred was the name of the magazine and the logo head. In 1981 ECI was giving away the T-shirts because it did not expect to ever advertise or sell them again. No more shirts were printed for about six years.

Mr. Forsythe, vice-president of ECI testified at trial that there had not been any intent to abandon the use of ESSENCE on T-shirts but the delay in printing was occasioned by an effort to update the design. He admitted that the sale of such shirts was not resumed until 1985, a date which was after the discovery in this case was completed. The evidence discloses that the design on the new T-shirts is substantially the same as was in use when ECI discontinued printing them in 1978 or 1979.

The other trademark registration asserted by ECI against the Plaintiff is United States Trademark Registration No. ('902), issued April 26, 1983, for the mark ESSENCE STYLE for retail mail order services. While this date is long after Anderson Hosiery began the use of its mark SHEER ESSENCE for pantyhose the Defendants claim a use date of 1980, which is prior to Ithaca's use. The application for this registration was filed by ESSENCE DIRECT MAIL MARKETING CORPORATION, one of the Defendants in this case and a wholly owned subsidiary of ECI. The evidence shows this to be a paper corporation as the witnesses did not seem to know who the officers and directors were although they had been designated as officers themselves. Mr. Forsythe, who was designated as chairman of the board and president at the time testified that EDMM had no officers, no bank account, and no paid employees. He stated he did not receive a salary as such officer and that all persons who

worked on the catalog were paid by ECI; that all expenses connected with the catalog were paid by ECI and all revenues from the catalog sales were retained by ECI.

The use of ESSENCE STYLE on which the application was based was a single mailing of a mail order catalog in September of 1980. It appears the catalog was intended as a test of mail order opportunities by ECI and was mailed to 20,000 randomly selected ESSENCE magazine subscribers. There has been no other ESSENCE STYLE catalog issued since the first one and on December 13, 1982 the board of directors for ECI rejected a proposal to proceed with a new catalog. In 1984 ECI tentatively decided to re-enter the mail order market through a joint venture with Hanover House, Inc. The agreement provided for the use of the name ESSENCE BY MAIL with Hanover House being licensed to use the mark ESSENCE and the design mark of a black woman's head with braids. Hanover House was not licensed to use the mark ESSENCE STYLE. Not until this litigation was ready for trial did the use of ESSENCE STYLE resurface and then in small print on an inside page of one of the ESSENCE BY MAIL catalogs.

ECI had on numerous occasions, like most magazines, offered readers the opportunity to purchase items by mail from the magazine. At one time or another the magazine contained offers of sale binders, within which readers could keep their copies of the magazine, and poster reproductions based upon the magazine's covers. It had carried offers of sale for books and art prints and for a brief time around 1977, items such as luggage carriers and wine coolers. In making these latter offerings, ECI did not show itself as associated with the goods, except as being one place where the goods made by others could be obtained. The word ESSENCE was not used as a trademark on any of the items offered for sale. None of the goods were advertised or sold except through the pages of the magazine. No other goods were offered for sale prior to Anderson Hosiery's adoption and use of its mark for sheer pantyhose.

On May 17, 1983, ECI entered into an agreement with Wundies, Inc., wherein Wundies was authorized to use "the name and trademark ESSENCE" and the trademark design of a black woman's head with braids, in connection with the manufacture and sale of women's and children's underwear and pajamas. In June 1983 ECI announced its license agreement with Wundies, Inc., and issued numerous press releases concerning the adventure. The story was published in a number of trade publications and newspapers and ECI advertised the licensed panties in at least the November 1983 and 1984 issues of the magazine. In each advertisement, the ESSENCE magazine logo of a black woman's head with braids appeared and the link between the panties and the magazine was made clear.

The Defendants offered in evidence specimens of the ECI licensed panties sold, including their labeling. Each of the panties bore ESSENCE magazine's trademark design of a black woman's head with braids embroidered on the panty itself; each label also bore the design, as well as the word ESSENCE printed in the same typeface as is employed by the magazine on its cover.

On July 12, 1984, EDMM and Hanover House, Inc. created a partnership entitled ESSENCE BY MAIL, for the purpose of selling merchandise by mail to black consumers. The first ESSENCE BY MAIL catalog was distributed in September 1984 and catalogs have been published and distributed approximately four times per year since. More than half of the items carried in the catalog are articles of clothing with the remaining products including fashion accessories, gift items and a variety of other goods. These catalogs use a prominent logotype, in which the word ESSENCE is the most prominent part of the mark and it appears in the same block type as that used for the magazine title on the cover. The catalog also carries the design logo of a black woman's head with braids.

In 1983 ECI and a New York television station, WPIX co-produced a TV show entitled ESSENCE ON TELEVISION. The

show was advertised in ESSENCE magazine and featured Ms. Susan L. Taylor, editor of the magazine as the hostess of the program. It did not expand beyond the one station and was terminated in early 1984.

In late 1984 ECI began the production of a nationally syndicated television program called, ESSENCE THE TELEVISION PROGRAM. It was launched with publicity including full page ads in ESSENCE magazine. It was linked with the magazine with the advertisement containing the following statement, "Essence, America's leading magazine for black women, introduces Essence The Television Program," with emphasis on the fact that Ms. Susan L. Taylor, editor of the magazine would be the new show's hostess. This program has survived and is carried on 53 stations including cable. The evidence shows the program is successful and has possibilities of expansion.

ECI contends that it has planned since 1978 to license its name and trademark ESSENCE on many other products. In August 1982 ECI entered into its first and to date only licensing representation agreement. This was an agreement with Joan Hansen & Company dated August 2, 1982 and provides for the licensing of a host of items, including apparel, luggage, vitamins, exercise equipment, greeting cards and other products. Ms. Hansen planned in an elaborate manner and reported to ECI that, ESSENCE will succeed because of specific aspects of its name. She established a schedule of action which included trademark review and enforcement. The recommendations and schedules were presented to and approved by the board of directors of ECI. The first interest in pantyhose sales was revealed in a letter dated September 13, 1982, wherein Ms. Hansen recommended a licensing program for pantyhose. The board approved the proposal and Ms. Hansen began her efforts to interest some pantyhose manufacturer in making such product. Only one manufacturer showed any interest in the proposal but no licensing agreement ever resulted. ECI terminated its relations with the Hansen Company without ever consummating any licensing agreement. To date no licensing arrangements have been made by the Defendants other than the agreement with Wundies for panties and related items.

In April 1981 when Anderson Hosiery first adopted and used SHEER ESSENCE for pantyhose and as of May 1982, by which time Anderson Hosiery had commenced large scale shipments and sales of the pantyhose in its ethnic package, ECI was marketing to the public its magazine, a trial venture at marketing T-shirts carrying the name ESSENCE and the magazine's logo and a trial mail order catalog under the ESSENCE STYLE designation.

*Other ESSENCE Marks*

ECI offered evidence of its own ESSENCE-labeled products to show the strength of its mark and that consumers would inevitably associate the word "essence" with its magazine. The Defendants contend that very few products are on the market using the word "essence" in their name, and that they are making every effort to stop such use. The Plaintiff's evidence shows without a doubt that ESSENCE is and has been for years used on a variety of products not associated with ESSENCE magazine. One witness testified at trial that he visited several stores or shops in New York across the street from the offices of the Defendants and found several items on the shelf for sale containing the word "essence," including CONCENTRATED APPLE ESSENCE hair care products directed specifically at the black female market; a selection of DIORESSENCE perfumes, and a selection of Clairol's ESSENCE products. He also testified to many items of a similar nature found in stores in Durham, North Carolina. Including those and other products, physical specimens of 103 ESSENCE branded products not affiliated with Defendants were presented in evidence during the trial. Those products included two different brands of pantyhose in a variety of shades; blouses; a skirt; a night jacket; nightgowns; a robe; a wide variety of personal toiletries; a burn lotion; bath oil; hair care; powder; perfumes, and a host of other products.

Manhattan Industries manufactures and sells garments under SILKESSENCE and LINESSENCE trademarks without any reports of confusion. Advertisements and promotional articles for third party "essence" products were entered in evidence. Twenty-five advertisements and articles from the pages of ESSENCE magazine alone were introduced and ten from other black-oriented magazines were also presented during the trial. Some sixty-one other advertisements of ESSENCE products from a variety of sources, including the Charlotte Observer newspaper, containing advertisements from Belk Department Store; Avon Products, Inc.; Durham Morning Herald newspaper; Sears catalog and many others. These ESSENCE labeled products included bath oils, skin creams, hair conditioners, tanning lotions, an automobile and fish attractants, and included products from companies, such as Avon, that advertise in ESSENCE magazine.

The evidence showed that consumers can find in the marketplace, products bearing such names as PEARLESSENCE (for pantyhose and earrings); ESSENCE OF SILKESSENCE (for pantyhose); SILKESSENCE (for clothing); SATINESSENCE (for clothing); QUINTESSENCE (for clothing, a book and a fragrance); SHEER ESSENCE (a mark identical with the one at issue but used for cologne), and many more.

Trade directory and telephone book listings of third party ESSENCE companies were admitted showing approximately 66 third party businesses using the word ESSENCE as all or a significant part of their name.

Certificates of registration from the Trademark Office were entered in evidence showing that there are at least 80 subsisting federal trademark registrations of marks incorporating the word ESSENCE or very slight variations thereof. The goods covered by these registrations included clothing (lingerie, robes, blouses, dresses and pantyhose); personal toiletries (including moisture cream, soap, perfume, cologne, hair care products), foods and many others. There was no evidence that ECI had played any role in the issuance of most of these registrations. In fact most of them were issued before ECI was formed. In summary, the use of ESSENCE by ECI constitutes but a very small part of the ESSENCE marks in use in the marketplace and registered by the Trademark Office.

Sometime after September, 1982, ECI began an effort to stop the use of the word "essence" on any product even in fields where it had never been involved. While it appears from its contentions that it is concerned about products aimed at the black female market, the evidence indicates that efforts are being made to stop the use of the name on products aimed at the entire marketplace. Nor is there necessarily any significant relationship between the products and the magazine. Efforts have been made to stop the use of the word "essence" on tobacco products, wallpaper, and many other such items.

*Likelihood of Confusion*

A. Intent

ECI contends that Plaintiff intentionally adopted the trade mark SHEER ESSENCE in an effort to capitalize on the goodwill of ESSENCE magazine and offered James Roberts, a former employee of Anderson Hosiery, who testified that the matter was discussed by himself, Mr. Waller and Rod Spruill. Mr. Waller denied any such conversation took place and Mr. Spruill, who is now president of a competitor of Ithaca, testified by way of deposition that he had no recollection of such conversation. Mr. Roberts, who was discharged by Mr. Waller, exhibited a considerable amount of adverse feeling toward Ithaca during his appearance which makes his testimony suspect. No other evidence supports this contention. The actions of Anderson Hosiery are inconsistent with an intent to copy the mark or to associate its product with the magazine. No effort was made to copy the design logo of a black woman's head with braids which is used by the magazine and all products offered for sale by the Defendants. There was nothing about the use of the mark or the efforts to sell the pantyhose by Anderson to indicate an intent to

copy or to cause confusion except the bare use of the word "essence" in its mark. The testimony of Defendants' expert witness that Ithaca must have intended to trade on the goodwill of ESSENCE magazine because it did not spend a large sum of money to study the name, test the market and to advertise the pantyhose overlooks the evidence in the case. The evidence shows that Ithaca is the leader, or one of the leaders, in the manufacture of sheer hosiery in the nation and has developed a successful method of selling its goods. This method was in use long before ESSENCE magazine was born and the officials of Ithaca decided to follow that route instead of the one thought best by Defendants' expert witness.

### B. Similarity of Marks

The relevant marks for comparison are Ithaca's mark SHEER ESSENCE as used on its pantyhose and ECI's mark ESSENCE as used on its magazine. This is so because at the time Anderson Hosiery adopted and used its mark ECI did not use the mark ESSENCE in connection with any other product or service marketed to the public. It is doubtful that the results would be different if the other products, that is the T-shirt and catalog, were considered as the Defendants have consistently employed the same logotype for their ESSENCE mark, and have used it in association with the same design mark of a black woman's head with braids. It is clear that SHEER ESSENCE pantyhose bear no resemblance to ESSENCE magazine in their packaging, logo, typestyle, or the positioning of the trademark; and do not include any emulation of the design of a black woman's head with braids.

While Ithaca's mark SHEER ESSENCE does include the word "essence" it also includes the word sheer. It is common knowledge that the word sheer is descriptive as applied to pantyhose and is very important in the marketplace. Hosiery manufacturers have spent years and sizeable sums of money in an effort to make sheer hosiery, especially for women. One of the dictionary meanings of the word sheer is "of very thin or transparent texture" and the present day sheer pantyhose is quite an improvement, in the minds of fashionable females over the old fashioned cotton stockings of fifty years ago. The Court will venture the assertion that the improvement in the thickness and transparent texture of female hosiery and pantyhose has not escaped the notice of males of the land regardless of their age or race.

The importance of the sheer component of the mark is further emphasized by the packaging used and the display racks employed in the sale of the product. In all of these efforts, the ultra-sheer nature of the product is emphasized. The buying public would have no doubt that the mark is intended to suggest the sheerness of the pantyhose. It is therefore probable that the mark SHEER ESSENCE for pantyhose, to the consumer is significantly distinct from ESSENCE as a mark alone.

### C. Similarity of Products

SHEER ESSENCE pantyhose are similar to ESSENCE magazine only in the following respects: both are products for women; both include black women as a significant segment of their intended market, and both are marketed in supermarkets and variety stores. However the same comparisons can be made for almost all of the other ESSENCE products to which consumers are exposed.

### D. Effect of ECI's Expansion

The evidence shows that ECI's expansion into categories including television, licensed sale of panties and the mail-order catalog business shows strength of the ESSENCE mark and establishes a likelihood of confusion. Despite the fact that all of the products sold by the Defendants carries the black woman's head with braids emblem the registration of the mark for T-shirts signaled an entry into the textile field and the licensed sale of panties establishes a likelihood of confusion in the marketplace.

### E. Marketplace Effect

Despite the likelihood of confusion and all the discovery efforts of counsel in prep-

aration for trial there was no evidence of actual confusion in the marketplace. The only hint of any confusion came from the testimony of Defendants' expert witness who stated that during the trial she talked to a saleslady in a Charlotte store and elicited from her in response to an inquiry that the saleslady thought there might be a connection between SHEER ESSENCE pantyhose and ESSENCE magazine. The saleslady was not called as a witness.

## CONCLUSIONS OF LAW

The parties stipulated and the Court finds and concludes that this Court has jurisdiction over the parties and the subject matter and that venue is proper in this district.

### The Validity of the ESSENCE T-shirt Registration

The United States Trademark Registration No. 1,204,615 was properly issued on August 10, 1982 for the mark "ESSENCE used for clothing—namely, T-shirts," and under the law it is presumed to be valid and the Defendant, ECI, as owner of such mark, has the exclusive right to use the mark in commerce on the goods and services specified in the registration. 15 U.S.C.A. Sections 1057–1115.

The Plaintiff contends that the registration for the mark "ESSENCE used for clothing—namely, T-shirts" is invalid because the mark was abandoned and that ECI's use of the mark on T-shirts was not a trademark use.

Under 15 U.S.C.A. Section 1115(b)(1) the owner of a mark loses his right to the exclusive use of it if the mark has been abandoned and Section 1127(a) defines abandonment as follows:

A mark shall be deemed to be abandoned—

(a) when its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

■ Abandonment is an affirmative defense and the party alleging it must prove by a preponderance of the evidence that the mark was abandoned and intent to abandon. *Skippy, Inc. v. CPC Intern. Inc.*, 674 F.2d 209, 216 (4th Cir.1982). The Plaintiff presented evidence that no T-shirts were offered for sale for perhaps four years and the admission of an officer of ECI that its use was discontinued with intent not to resume. This positive evidence together with the presumption raised by the nonuse is sufficient to prove abandonment, nothing else appearing. ECI offered testimony of another officer, that T-shirt sales were discontinued in 1981 because the design then being used was regarded as obsolete and because it was felt that the company did not have an appropriate vehicle for marketing a new design. He testified that when the appropriate vehicle was found, namely, the ESSENCE BY MAIL catalog, a new T-shirt was designed and sales were resumed. This issue is a close one but in view of the fact that abandonment is a forfeiture of a property interest courts should be reluctant to find abandonment, and statutory aid to such proof should be narrowly construed. 1 J.T. McCarthy, Trademarks and Unfair Competition § 17.3 at 592–93. *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2nd Cir.1980). The Court must therefore find and conclude against the abandonment defense.

■ The other contention of the Plaintiff that the use of ESSENCE on the T-shirts was not a trademark usage is without merit. It is true that the evidence offered on this point could lead to a two-fold inference about the T-shirt sales. One inference which can be drawn from the evidence is that the T-shirt sales was a promotion scheme never intended to put ECI in the business of selling T-shirts. In fact very few were sold and many were given away in promotional efforts. The other inference is that ECI intended to capitalize on the acceptance of the magazine by selling T-shirts by mail order. Words can, in some situations, serve both an ornamental and a trademark function. Words emblazoned on the front of T-shirts, on decals, and the like have been held to constitute trademarks in particular cases. See, e.g., *In re Expo*, 189

U.S.P.Q. 48 (T–T.A.B.1975), where the slogan "Expo 74" when emblazoned on a T-shirt was held to constitute a valid trademark. In such dual-function cases, however, the words must "identify the source of the goods and distinguish the goods from those that are sold by others," in the eyes of the consumers. *Id.*, 189 U.S.P.Q. at 49.

The evidence presented leads to the inference that ECI intended the T-shirts to do more than show allegiance of the purchaser to the magazine. The use meets all the requirements of the law and this contention must fail.

The Court finds and concludes that United States Trademark Registration No. 1,204,615 is valid.

*The Validity of the Essence Style Retail Mail–Order Registration*

The United States Trademark Registration No. 1,235,902 for the mark ESSENCE STYLE for "retail mail order services for women's clothing and accessories, jewelry and home furnishing accessories" was issued on April 26, 1982 to Essence Direct Mail Marketing Corporation (EDMM) and such mark is entitled to a presumption of validity.

■ Ithaca contends that the mark is invalid because EDMM was not the true owner of the mark at the time of the filing of the application for registration and that false statements were made in the application. Ithaca also contends that the registration had been abandoned.

The evidence shows that EDMM is a wholly-owned subsidiary of ECI and its officers are officers of ECI. Both corporations are headquartered in the same office space and use the same employees. Ithaca contends that EDMM is a paper corporation with no office, officers, bank account or employees, and that when the officers certified to the Trademark Office that the corporation was "doing business," and had "a principal place of business at 1500 Broadway, New York" these were false statements. It is also contended that EDMM did not own the mark and made no use of it.

Title 15 U.S.C.A. Section 1051 provides that the "... owner of a trademark used in commerce may register his trademark ..." Section 1201.02 of the Trademark Manual of Examining Procedures elaborates upon the requirements of the statute and states that as between parent and subsidiary corporations, ownership of a mark is a matter to be decided by the parties. Trademark Manual, Section 1201.02(b). See 1 J. McCarthy Trademarks and Unfair Competition, *supra*, Section 16.13(c) at page 748; see *Borden, Inc. v. Great Western Juice Co.*, 183 U.S.P.Q. 570 (T.T.A.B.1974) in which applications by subsidiary corporations to register two trademarks were opposed. The subsidiaries were wholly owned and controlled by a parent corporation. The Trademark Trial and Appeal Board treated the trademark applications as the common property of the parent and subsidiary corporations.

The Court finds and concludes that these claims by Ithaca are without merit.

■ Ithaca also raises the issue of abandonment as to Registration No. '902. Since the mark was not used for a period of more than two years the statute raises the presumption of abandonment and shifts the burden to the Defendants to show the mark had not been abandoned. The Defendants offered evidence by their officers that they did not intend to abandon the use and that they did in fact use it on a recent issue of an ESSENCE BY MAIL catalog.

The Court finds and concludes that United States Trademark Registration No. 1,235,902 for the Trademark ESSENCE STYLE for "retail mail order services for women's clothing and accessories, jewelry and home furnishing accessories" is valid.

*Infringement*

The Plaintiff seeks a declaration of this Court that the use of the mark SHEER ESSENCE on pantyhose does not infringe ECI's mark ESSENCE for a magazine. The word essence is a common speech word and the use of such words in trademarks creates problems in establishing secondary meanings. There is no question as to the validity of ECI's mark ESSENCE for a

magazine and any use of such mark on another magazine would constitute infringement. The problem here is whether the protection of the trademark law extends to other products such as pantyhose not made or sold by ECI. As Judge Learned Hand observed in *Landers, Frary & Clark v. Universal Cooler Corp.*, 85 F.2d 46 (2nd Cir.1936);

> It is quite true that, just as a coined word is easier to protect than a word of common speech upon goods on which the owner has used it, so it is easier to prevent its use upon other kinds of goods. The proprietary connotation, "secondary meaning,"—of a word of common speech is harder to create and easier to lose, and its fringe or penumbra does not usually extend so far as that of a coined word.

In the case of *Time, Inc. v. T.I.M.E. Inc.*, 123 F.Supp. 446 (U.S.D.C.Calif.1954) Time magazine sought to enjoin the use of the word Time by a motor express company. Judge Mathes held that:

> "Time," as plaintiff employs it being both an ordinary word as opposed to a coined word, and a descriptive word as opposed to a fanciful word, the protection necessary to be extended in order to avoid likelihood of confusion among purchasers, 15 U.S.C.A. § 1114, is properly limited at least to the area of news communication, if not to the narrower area of printed news magazines, where plaintiff has established some secondary meaning.
>
> Whatever confusion of the public results from the use of the word "Time" by organizations other than plaintiff is occasioned in part by plaintiff's choice in selecting such a common word for its trade name and trade-mark. Since plaintiff cannot exclude the world from the use of so common a word as "Time," non-competitors of plaintiff such as defendant truck line should be free to make any use of the word not likely to confuse.

In *Johnson Publishing Co., Inc. v. Wilfred–Nelmore, Inc.*, 175 U.S.P.Q. 279 (T.T.A.B.1972) the United States Patent Office Trademark Trial and Appeal Board

passed upon a matter quite similar to the facts of this case. Johnson Publishing Company is the owner of the federal registration mark "Ebony" for a magazine directed to the black people of America which carries substantial advertisement including advertisements by manufacturers of cosmetics. The magazine also conducts an annual "Ebony Fashion Fair" directed primarily to the black female segment of the public. It also publishes an "Ebony cook-book," has an "Ebony Book Club" and an "Ebony–Jet Record Club," and all of these activities are promoted from time to time in the magazine. The defendant sought to register the mark "Ebony Glo" for a body lotion it was marketing and Johnson filed an opposition. In dismissing the opposition the Board held:

> While it is true that opposer's mark "Ebony" must have acquired a secondary significance for its magazine and the other activities conducted under the mark because of the use and promotion thereof over the years, this factor does not necessarily give it any such broad rights in "Ebony" as to preclude the use or registration of this word for any article of merchandise advertised in its publications. To do so would be tantamount to giving opposer a right in gross for its mark. In our considered opinion, applicant's composite mark, which includes the word "Glo" and a distinctive design element, does not so resemble opposer's mark "Ebony" that persons would be likely to believe that applicant's product either originates with or is somehow sponsored by opposer.

If no other registration mark was involved in this case the Court would be inclined to find and conclude that there is no likelihood of confusion and therefore no infringement. But two other marks are involved here both of which have been held to be valid by this Court. These registrations permit ECI to use the mark ESSENCE in the field of apparel, including T-shirts and for "retail mail order services for women's clothing and accessories." These uses present a different picture as to the likelihood of confusion.

The parties are not competitors in any sense of the word. ECI does not manufacture and sell women's clothing or anything else except a monthly magazine. Ithaca is a manufacturer of hosiery and has been for many years. There is no evidence of actual confusion of these products and neither party has received any report of actual confusion in the marketplace. When the parties are not competitors and there is no actual confusion in the marketplace the issue of infringement hinges on the likelihood of confusion about the source or sponsorship of the goods and services. *Communications Satellite Corp. v. Comcet, Inc.,* 429 F.2d 1245, 1252 (4th Cir.1970), *cert. denied,* 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 245 (1970).

In *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522 (4th Cir.1984) the Court of Appeals considered the following seven factors in determining the likelihood of confusion between two marks which applied to restaurant services: (1) the strength or distinctiveness of the marks; (2) the similarity of the marks; (3) the similarity of the goods or services the marks identify; (4) the similarity of the facilities the two parties use in the businesses; (5) the similarity of the advertisement used by the two parties; (6) the junior user's intent, and (7) actual confusion. The Court pointed out that not all of these factors are always relevant or equally emphasized in each case.

The evidence shows and the Court finds and concludes that the trademark ESSENCE is a strong, distinctive and well known name for the magazine published by ECI and is entitled to a high degree of protection in that field. The third party uses and registrations of such a common word as shown by the evidence tends to limit the protection to be accorded to the mark outside the magazine field. It is a common English word used frequently by speakers and writers of the English language. It is not a coined name, and while its application to the magazine may be arbitrary, it is still not to be accorded the same degree of protection given such coined and fanciful terms as "Kodak" or "Xerox."

*Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252 (5th Cir.1980).

The marks of the parties are similar in that both use the word essence but there are no other similarities. There is no similarity of the goods and services insofar as the magazine is concerned but there is some similarity in that both now sell women's apparel. In the advertisement of their products both parties use the image of a black female—ECI the head of a black female with braids and Ithaca a model with the Diana Ross look wearing pantyhose.

■ The Court finds and concludes that Ithaca did not intentionally copy ECI's trademark nor did it intend to trade on or exploit the goodwill created in the marketplace by ESSENCE magazine. There has been no confusion of the goods in the marketplace and ECI has not sustained any losses or damages by the use of the SHEER ESSENCE name on Ithaca's pantyhose.

■ However, the Court finds and concludes that in view of the present use by ECI of its mark '615 ESSENCE "for clothing—namely, T-shirts" and its mark '902 ESSENCE STYLE "for a retail mail order service for women's clothing and accessories" there is a likelihood of confusion in the marketplace. ECI is now actually engaged in selling by mail order women's apparel and accessories and these goods, like Ithaca's pantyhose, are directed specifically to the black woman's market. It would be easy for customers to assume that sheer pantyhose sold under the name SHEER ESSENCE and other apparel and accessories sold under the name of ESSENCE STYLE, all for black women, were made and sold by the same company. Ithaca will be enjoined from the use of the word essence in the sale of its pantyhose.

The Court concludes that the evidence does not support any anti-trust violation or any finding of unfair competition under either federal or state statutes.

■ The Court finds and concludes that under the facts of this case the principles of equity would dictate against an award of damages and profits. The parties are not

competitors and the specific goods in question did not compete in the marketplace. The Defendants have lost no sales or suffered in their business reputation by the sale of the pantyhose by the Plaintiff. The magazine suffered no loss of advertisement and there is no evidence that Plaintiff attempted in any way to pass off the pantyhose as a product of the Defendants other than the bare use of the word essence in the name. In the interest of fairness and justice no award of damages and profits will be entered in this cause. The Court will therefore not conduct an additional trial for the purpose of determining damages.

The Court has carefully examined all other claims set forth by the Plaintiff and concludes they are without merit.

The Court further concludes that this is not an exceptional case and attorney fees will not be ordered.

A judgment of the Court will be entered denying all claims set forth by Ithaca. The Defendants' counterclaims will be denied except their demand for injunctive relief enjoining Ithaca from using the word essence in its trademark for pantyhose. Counsel for the parties will agree upon an appropriate judgment in accordance with these findings and conclusions.

## JUDGMENT

THIS MATTER was tried by the undersigned United States District Judge, without a jury, during the April, 1986 term of this Court in Statesville, North Carolina and the Court determined the issues as set forth in its findings and conclusions in a Memorandum of Decision filed June 23, 1986.

Now, therefore, in accordance with the Court's findings and conclusions, IT IS ORDERED, ADJUDGED AND DECREED as follows:

1. As between the parties hereto, Defendants are declared to be the prior users of the ESSENCE trademarks and Plaintiff's mark SHEER ESSENCE is declared to be likely to be confused with Defendants' ESSENCE trademarks when applied to the parties respective goods and services.

2. United States Trademark Registration No. 1,131,774 for the trademark ESSENCE for a magazine concerning matters of general interest to women, United States Trademark Registration No. 1,204,615 for the trademark ESSENCE for clothing, namely T-shirts, and United States Trademark Registration No. 1,235,902 for the trademark ESSENCE STYLE for retail mail order services for women's clothing and accessories, jewelry, and home furnishing accessories are declared to be valid, owned by Defendants and infringed by Plaintiff's use of the trademark and tradename SHEER ESSENCE.

3. All claims of the Plaintiff are hereby dismissed with prejudice.

4. The Plaintiff, its officers, agents, servants, employees and attorneys and those persons in active concert or participation with the Plaintiff who receive actual notice of this judgment, are hereby permanently restrained and enjoined from using the word ESSENCE as a part of its trademark and tradename for pantyhose. Plaintiff and said persons are, however, allowed until September 12, 1986 to dispose of Plaintiff's remaining inventory of infringing goods and literature related thereto.

5. All counterclaims of Defendants not alleging trademark infringement and seeking the relief granted above are hereby dismissed with prejudice.

6. Defendants shall recover no damages from the Plaintiff.

7. Allowable court costs shall be taxed against the Plaintiff. No attorneys' fees shall be awarded as part of court costs or otherwise.

8. The Clerk is directed, pursuant to 15 U.S.C.A. § 1116(c), to mail a certified copy of this judgment to the Commissioner of Patents and Trademarks. The Clerk shall, in such communication, refer to Trademark Opposition No. 68,157 and Trademark Opposition No. 72,387 between the parties hereto.