Tamara Lisa **HUTCHINSON** and Joseph Saddler, Plaintiffs,

v.

**ESSENCE COMMUNICATIONS, INC., Defendant.**

**No. 91 Civ. 2875 (CSH).**

United States District Court, S.D. New York.

July 26, 1991.

---

**544**

Surkin & Handlin, New York City (Dean L. Surkin, of counsel), for plaintiffs.

Warshavsky, Hoffman & Cohen, P.C., Stoll, Previto & Hoffman, New York City (Stephen D. Hoffman, Doris Hoffman, of counsel), for defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff brought this action under the Declaratory Judgment Act, 28 U.S.C. § 2201, for a declaration of non-infringement of trademark, damages, and injunctive relief. Defendant counter-claimed for trademark infringement, damages, and injunctive relief. Subject matter jurisdiction is based on 28 U.S.C. §§ 1338 and 1332. Venue lies under § 1391(b). The Court directed expedited discovery and advanced the action on the trial calendar. Rule 57, Fed.R.Civ.P. A bench trial on the merits commenced on June 24, 1991 and was concluded on July 2. What follows constitutes the Court's findings of fact and conclusions of law. Rule 52(a).

### Background

Plaintiff Tamara Lisa Hutchinson is a black female.[1] Hutchinson graduated from high school in New York City in January 1990. She also attended the Bernice Johnson School, a dance school in Queens. She is a performer of rap music. Rap performers sing. They may also dance. Rap singing may be defined as spoken or semi-sung rhyming verse recited over a powerful rhythm track. It is lyrics over an almost exclusively percussion-based melody. Hutchinson has taken the professional name of ESSENCE.

Plaintiff Joseph Saddler is a producer of popular records. He is also known as Grand Master Flash, from the days when he was a leading rap performer and found-

---

1. I am sensitive to the increased preference that the phrase "African–American" be used instead of "Black." However, the witnesses in this case almost invariably used the word "black" which also appears in the exhibits. Accordingly, to conform this Opinion with the evidence, I will use the word throughout.

er of the group known as Grand Master Flash and the Furious Five.

Defendant Essence Communications, Inc. ("ECI") has as its "primary business"[2] the publication of ESSENCE Magazine (the "Magazine"). The first issue of the Magazine was published in April 1970 and monthly thereafter. In addition to publishing ESSENCE Magazine ECI engages in direct mail marketing of certain consumer goods, licensing of certain consumer goods, and investments. In 1979 ECI filed the trademark ESSENCE for the Magazine with the United States Patent and Trademark Offices, describing the goods as a "magazine concerning matters of general interest to women." In point of fact, ECI targets the Magazine particularly toward younger black women.

In February 1991 Hutchinson, performing under the stage ESSENCE and with the assistance of Saddler with whom she has entered into a production contract, recorded a rap song called "Lyrics 2 the Rhythm." Saddler introduced the song to the producers of a movie called "New Jack City." The song found favor with the movie producers. "Lyrics 2 the Rhythm" formed a part of the musical sound track for "New Jack City." In the credits for the movie, the singer of "Lyrics to the Rhythm" was identified as "ESSENCE." Edward Lewis, ECI's chairman and chief executive officer, attended a showing of the movie, observed that credit, and was displeased. He instructed counsel, who caused a "cease and desist letter" to be sent to Giant Records, Inc., with whom Hutchinson and Saddler had contracted for the production and distribution of Hutchinson's recordings. The cease and desist letter had its desired effect and Hutchinson's career under the stage name "ESSENCE" has been placed on hold. Plaintiffs thereupon brought this action for judicial declaration of non-infringement. ECI counterclaimed for infringement.

*Discussion*

*Protectability of ECI's Mark*

■ A magazine title may give rise to a protectable trademark. In *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14 (2d Cir.1985), the Second Circuit found the magazine title CLASS to be suggestive, and accordingly protectable, because it requires imagination, thought and perception to reach a conclusion as to the nature of its goods. *See also Inc. Publishing Corp. v. Manhattan Magazine, Inc.,* 616 F.Supp. 370 (S.D.N.Y.1985), *aff'd* 788 F.2d 3 (2d Cir.1986) ("Inc." as title of magazine suggestive and accordingly protectable.) Two district courts have held that ESSENCE as the Title of ECI's magazine is suggestive and accordingly entitled to trademark protection. *Essence Communications, Inc. v. Singh Industries, Inc.,* 703 F.Supp. 261 (S.D.N.Y.1988); *Ithaca Industries v. Essence Communications, Inc.,* 706 F.Supp. 1195 (W.D.N.C.1986).

■ I reach the same conclusion in the case at bar. It is also apparent that in respect of the name ESSENCE, ECI is the senior user and Hutchinson is the junior user.

*Likelihood of Confusion*

■ The central issue in a trademark infringement case is whether the junior user's use of the name gives rise to the likelihood of confusion among consumers of the junior user's goods or services.

Likelihood of confusion is the particular target of the governing federal statute, the Lanham Trade–Mark Act, 15 U.S.C. § 1051 *et seq.,* which "protects against false designations of origin and false description or representation," *Thompson Medical Company, Inc. v. Pfizer, Inc.,* 753 F.2d 208, 212 (2d Cir.1985) (footnote omitted).

■ Given a valid trademark, the critical issue in an action for trademark infringement "is whether there is any likelihood that an appreciable number of reasonable consumers would be misled or simply con-

---

**2.** Trial testimony of Edward Lewis, chairman of the board and chief executive officer of ECI, at Tr. 357.

fused as to the source of the goods in question." *C.L.A.S.S. Promotions, Inc., supra,* at 17.

In *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 (3rd Cir. 1978), the Third Circuit gave a more expanded version embracing both goods and services:

> Likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.

■ In evaluating confusion in a trademark infringement case, it is important to remember that the courts are dealing with confusion as to source, and that the only "relevant population" is potential purchasers of the junior user's goods or services. *Lobo Enterprises, Inc. v. Tunnel, Inc.,* 693 F.Supp. 71, 77 (S.D.N.Y.1988). Where the senior and junior user's products are of the same kind, the population of consumers is the same. Thus in *Inc., supra,* where plaintiff charged that the title of defendant's magazine infringed the title of plaintiff's magazine, I identified the "consumers" of magazines as: "advertisers; readers by subscription; and readers who purchase single copies of newsstands." The question in that case therefore became whether such consumers of defendant's magazine "would be 'misled, or simply confused' or 'would probably assume,' that the plaintiff published defendant's magazine." 616 F.Supp. at 377.

■ In the case at bar, the senior user's mark is the title of a magazine, and the junior user's mark is the stage name for a rap performer. Accordingly I must focus upon the consumers of the junior user's services. I define them to be: individuals who listen to rap music at live performances or on recordings such as single records, compact discs, tape cassettes or video tapes; and individuals who purchase such recordings.

The question therefore becomes whether consumers of rap music, so defined, would be misled, or confused, or would probably

assume that ECI, as publisher of ESSENCE Magazine was commercially associated with, promoted, or sponsored a rap performer called ESSENCE.

As Judge Mukasey observed in *Lobo Enterprises, Inc.* at 72, decisions in Lanham Act cases "usually are highly fact-specific" because such decisions require a "comprehensive analysis of all the relevant facts and circumstances," *Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960, 968 (2d Cir. 1981), and require consideration of "all factors bearing on the likelihood of confusion," as well as "balancing the conflicting interests of the parties involved." *McGregor Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1132, 1140 (2d Cir.1979). *See also, Thompson Medical Co. v. Pfizer, Inc., supra* at 214 ("[E]ach trademark infringement case presents its own unique set of facts.")

■ In making its determination and fashioning equitable relief, the Court must look "not merely to the similarity of the conflicting marks but to a number of other factors." *C.L.A.S.S. Promotions, Inc., supra,* at 17. Those other factors have come to be known as the *"Polaroid* formula," in tribute to Judge Friendly's opinion in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.) *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Judge Friendly there wrote:

> Where the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account.

"Other variables" identified in subsequent cases reflect the fact that the district court, in granting or withholding injunctions in trademark infringement cases, acts as a court of equity. Thus district courts

are directed to engage in a more general balancing of "the conflicting interests of the parties involved," *McGregor–Doniger, Inc., supra,* at 1140, and such equitable factors as "the nature of the senior user's priority, the senior user's delay in asserting its claim, and the harm to the junior user as compared to the benefit of the senior user that would result from the requested injunction." *Thompson Medical Co., Inc., supra,* at 214, citing *Chandon Champagne Corp. v. San Marino Wine Corp.,* 335 F.2d 531, 536 (2d Cir.1964).

It follows that "[n]o single *Polaroid* factor is pre-imminent, nor can the presence or absence of one without analysis of the others, determine the outcome of an infringement suit." *Thompson Medical Co., Inc.,* at 214.

I will now consider each of the *Polaroid* factors in the light of the trial evidence.

*Strength of ECI's Mark*

Both district courts considering the matter have concluded that ECI's trademark ESSENCE is strong, distinctive and well-known name for the Magazine, and accordingly entitled to a high degree of protection in that field, but of limited and diluted strength in other fields. *Ithaca, supra,* at 706 F.Supp. 1209; *Singh, supra,* at 703 F.Supp. 266–67. These cases were decided in 1986 and 1988 respectively. It is necessary to consider to what degree the underlying facts may have changed during the succeeding years.

ECI's proof in the case at bar demonstrates that the strength of the trademark ESSENCE as a name for the Magazine derives from ECI's varied efforts to promote the Magazine and the publication's considerable success. Hundreds of trial transcript pages and dozens of exhibits (documentary and video tape) were devoted to demonstrating those facts. I need not recount the evidence in detail. It is sufficient to note that since its inception in 1970 ESSENCE Magazine has grown to a guaranteed circulation of 850,000, achieves a readership in excess of 4 million individuals per copy, in 1990 generated advertising revenues in excess of $20 million, and, as demonstrated by reliable trade studies, enjoys a high degree of loyalty and approval among its readers.

ECI has promoted the Magazine through advertisements, direct approaches to potential advertisers, and a variety of other marketing stratagems, in particular a near-annual series of evening presentations recognizing the achievements of black women in a number of fields of endeavor. These presentations, known as the ESSENCE Awards, began in 1987 and were repeated in 1988, 1989, and 1990. No awards presentation is scheduled for 1991. The next is planned for Spring of 1992. The history and nature of the ESSENCE Awards, to which ECI devoted considerable trial energy, are further considered *infra.* It is useful for present purposes to observe that, unlike industry-wide awards presentations such as those conferring the Oscars, the Grammies, and the Tonys, the ESSENCE Awards exist in large measure to promote a product: ESSENCE Magazine.[3] Indeed, the 1990 ESSENCE Awards, which attracted an audience of 6,000 to Radio City Music Hall in New York, was billed as marking the twentieth anniversary of the Magazine's founding.

ECI has used the name ESSENCE in other areas. Through its wholly owned subsidiary ESSENCE Direct Mail Marketing Corp., ECI issues a mail order catalogue called ESSENCE Style. In 1984, ESSENCE Direct Mail Marketing Corp. and Hanover House, a mail order company, formed a partnership for the purpose of producing a mail order catalogue called ESSENCE By Mail. The catalogue features clothing, fashion accessories, jewelry, and reproductions of works by black artists. Like the Magazine, the ESSENCE by Mail catalogue is aimed exclusively at black women.

ECI has provided a weekly half-hour telephone program, also entitled ESSENCE.

---

**3.** In saying that, I do not of course suggest that such promotion is anything other than commercially legitimate or that the recipients of ES-SENCE Awards were undeserving of recognition. One could not reasonably say that of, say, Leontyne Price.

The program was of the "magazine" type, containing features and interviews of interest to the black community. In 1983 the television show appeared on a local New York television station, WPIX. After that year ECI syndicated the program in association with NBC, and it appeared nationwide for four years, from 1984 to 1988, when ECI terminated the program for business reasons. The editor of ESSENCE Magazine, Susan L. Taylor, an impressive and articulate woman, was the hostess for the television program.

In December 1984 ECI registered the name ESSENCE for "entertainment services in the nature of television programs."

In addition, ECI licenses the trademark ESSENCE to the manufacturers or distributors of a variety of products. Lewis testified that ECI first considered licensing the name of ESSENCE in 1978 because, in view of the "promotion and credibility of the magazine that we had created since we had been in business we felt that black women would be buyers of products with the name ESSENCE." Tr. 378. ECI has licensed the name ESSENCE to manufacturers of wearing apparel, hats, eyeglass frames, jewelry, and apparel related products such as sewing patterns. The most recent license revealed by the evidence, granted in May 1991 by ECI to a group of rock musicians called RARE ESSENCE, permits that group to use the name ESSENCE on T-shirts and other merchandise.

ECI has never used the name ESSENCE in connection with the creation, production or distribution of live, video taped or recorded musical performances. Nor has ECI ever used the name ESSENCE in entering into a commercial association with, promoting or sponsoring a musical performer or performers, with the sole exception of the rock group RARE ESSENCE, whose license from ECI, as noted, is limited to articles of clothing.[4]

Nonetheless ECI contends that ESSENCE is a strong mark in the field of entertainment in general and musical entertainment in particular, as well as in the magazine field. Two questions arise: whether third party usage of the name ESSENCE dilutes the strength of ECI's trademark in the musical entertainment field; and whether ECI has proved that public awareness of its ESSENCE mark exists for musical entertainment or entertainers.

■ Third-party registration and use dilutes the strength of the trademark. *Singh* at 266, *citing Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999 (2d Cir.1983); *Lever Bros. Co. v. American Bakeries, Co.*, 693 F.2d 251, 256–57 (2d Cir.1982), and *Vitarroz Corp. v. Borden*, 644 F.2d 960, 968 (2d Cir.1981).

■ There has been a very considerable amount of third-party registration and usage of the name ESSENCE. This is not surprising since the word is in common English use. The district judge in *Ithaca* said, following trial, that "physical specimens of 103 ESSENCE branded products [not affiliated with ECI] were presented in evidence during the trial," and that Trademark office certificates of registration were entered in evidence "showing that there are at least 80 subsisting federal trademark registrations of marks incorporating the word ESSENCE or very slight variations thereof." 706 F.Supp. at 1203, 1204. The goods covered by those registrations included "clothing (lingerie, robes, blouses, dresses and pantyhose); personal toiletries (including moisture cream, soap, perfume, cologne, hair care products), foods and many others." *Id.* at 1204. ECI argues at bar that *Ithaca* describes conditions existing five years ago. That is true, but the passage of time does not support the inference that third parties have foresworn the use of so common a word. Indeed, plaintiffs at bar placed in evidence two bottles of shampoo currently on sale in New York drug stores: "Clairol Herbal Essence" and "Suave Strawberry Essence."

---

4. The 1990 ESSENCE Awards program included a group called the "ESSENCE Dancers." This was a pickup group of freelance dancers which disbanded when the evening was over and has not been reconvened.

In *Singh* Judge Sweet said: "A trademark search conducted by defendants [ECI's adversaries] turned up pending applications or registrations of marks employing 'Essence' for a variety of products including cosmetic and toilet preparations, skin care products, hair care products, body lotions, and jewelry and precious stones, among others." 703 F.Supp. at 266. Counsel for ECI in the case at bar, who successfully kept out of evidence a trademark search proffered by plaintiffs because it was not properly authenticated, contend that I cannot consider what Judge Sweet said in *Singh* because the trademark search to which the judge referred was equally inadmissible, untested by cross-examination, and should not have been considered by Judge Sweet. I do not find this protest persuasive. ECI took no appeal from Judge Sweet's opinion in *Singh* denying its motion for a preliminary injunction on the ground that the district court considered inadmissible evidence or on any other ground. Judge Sweet said what he said, and I may properly consider it.

ECI concedes that I am entitled to consider Exhibit 51 to the deposition of Carol Fenelon, head of business affairs at Giant Records. Fenelon requested a trademark research report for the name ESSENCE on August 31, 1990. The report reflects status information from the Official Gazette through September 4, 1990 and application information disseminated by the Patent and Trademark Office through July 6, 1990. The report appears to reflect a fewer number of registrations than the 80 noted by the district court in *Ithaca* during a trial held in April 1986; but ESSENCE is registered for a trademark for a number of goods and services, including "a feminine hygiene produced cleansing douche" and "artificial breast forms," products which presumably are targeted towards women.

I find that significant third-party registration and use of the name ESSENCE exists, which dilutes the strength of ECI's trademark in the field of musical entertainment.

As for the second question, there is no evidence of public awareness of ECI's ESSENCE mark for the creation, distribution, sponsorship or promotion of music, musical performances or performers.[5] In *Singh* ECI sought a preliminary injunction against a mail catalogue seller of jewelry using the trade name Diamond Essence. Judge Sweet said of the strength of ECI's ESSENCE marks:

> Because of third party usage, and because ECI has offered no evidence that public awareness of the ESSENCE mark exists for jewelry, which constitutes only a very small fraction of the items offered in ECI's catalogues, the factor of strength of mark favors ECI to the extent that it covers magazines; however, it favors Singh to the extent it covers jewelry.

703 F.Supp. at 266–67.

For the same two reasons, I conclude in the case at bar that the factor of strength of mark favors plaintiffs Hutchinson and Saddler in respect of the performance of rap music.

### *Similarity of the Marks*

 Hutchinson's mark and ECI's mark are the same: they consist of the single word ESSENCE. While plaintiffs suggest that at one point Hutchinson used the name "M.C. ESSENCE" or contemplated doing so [6], she was identified in the "New Jack City" soundtrack credits only as "ES-

---

**5.** ECI presented a quantity of evidence to show that ESSENCE Magazine covers the world of musical entertainment and entertainers, among other topics, as did the ESSENCE television program when it was on the air; and that recipients of ESSENCE Awards have included musical performers, more popular than classical. I discuss this evidence *infra* under that *Polaroid* factor known as "proximity of the product;" for present purposes, I note that it does not establish public awareness of the ESSENCE mark as a creator of music or musical performances, or as the sponsor or promotor of performances or performers. Journalism, though useful, is not to be confused with artistic creation or direct sponsorship or promotion of artists.

**6.** In the parlance of rap music, the initials "M.C." stand for "Master of Ceremonies" if the performer is male and "Mistress of Ceremonies" if the performer is female.

SENCE," and used that name in executing contracts.

The factor of similarity of marks favors ECI.

### Product Proximity

ECI's pre-eminent product with the ESSENCE name is a magazine. For five years ECI produced a television program, but has not done so since 1988. ECI also licenses third-party users, for the most part in the field of apparel or related products.

Hutchinson's product is her performance of rap songs, during which she sings and dances.

At first blush, indeed at second blush, these would appear to be different products. Nonetheless ECI argues that, through the Magazine and its television show, it is "in the musical entertainment business," Tr. 882, so that Hutchinson's performances constitute "related goods" vis-a-vis ECI, Tr. 885. Summarizing the factors he perceived as bearing on the factor of product proximity, counsel for ECI argued in summation:

> [F]irst we have the fact that Ms. Hutchinson is a young black female singer, we have the fact that Essence is a magazine directed to young black women that features strong and prominent coverage of entertainment both on its cover and on the inside pages, we have the fact that ECI has made extensive use of entertainment and music and musicians in the promotion of Essence magazine, we have the fact that ECI is itself in the musical entertainment business, through the Essence T.V. Show and the Essence Awards, and we have a substantial overlap in the markets for plaintiffs' rap music and for the market for Essence magazine. Tr. 899.

These factors, in counsel's submission, combine to produce a situation where

> musical entertainment in Essence magazine, in Essence Communications, in all the other Essence trademarks are very closely associated together in the minds of the public of the African-American public, with the result that it's likely that

African-Americans would expect that a young black female musical artist that took the name Essence was somehow associated with Essence Communications.

*Ibid.*

■ Two preliminary observations may be made. First, while ESSENCE Magazine is targeted toward younger black women, and plaintiff Hutchinson is unquestionably a young black woman, those facts in isolation cannot support a finding of product proximity. Were it otherwise, no young black women could use the trade name ESSENCE for any trade. That is not a proper application of trademark law.

■ Second, ECI is not in the "musical entertainment business," in any realistic, entrepreneurial, market place sense of the word "business." To the extent that ECI hires musical performers to put on the ESSENCE Awards shows (or a personality like Bill Cosby, whose hosting of the 1990 Awards Program was made much of at trial), ECI is a consumer of entertainment, not a purveyor, no different from any corporation hiring entertainers for promotion purposes. Nor does the bestowing by ECI of awards upon musical entertainers (among others), or the coverage of musical entertainers (among others) in a magazine or its television equivalent put ECI directly into the musical entertainment business. In the business of musical entertainment, ECI sows not, neither does it reap.

The question therefore becomes whether ECI's coverage of music and musical performers has been so prominent as to qualify musical entertainment as a business sufficiently related to ECI's business to justify an action for trademark infringement.

The nature and extent of ECI's coverage of musical entertainers, in the Magazine throughout and on the television program when it was being aired, generated much trial evidence. Counsel for ECI maximize the amount of that coverage. Counsel for plaintiffs minimize it. These are the predictable excesses of advocacy. But ECI's vehement, occasionally shrill, emphasis at trial upon its coverage of music and musi-

cians constitutes a significant exaggeration of the facts.

Lewis testified at trial that the original concept for ESSENCE Magazine "was to bring about a magazine of entertainment that dealt with fashion, beauty, what it is to be a black woman, to talk about her needs, aspirations and intelligence within the black experience." At present, the Magazine's concept is that "it remains a wealth of information, a lifetime magazine of entertainment. How it is in terms of black women in terms of dealing with jobs, housing, education, fashion, beauty, as well as entertainment." Tr. 361–62. Somewhat more succinctly, Taylor described ES-SENCE Magazine as "a full-service magazine for African–American women." She defined "full-service" to mean

> that we deliver to our readers information about fashion and beauty, health, fitness, interviews with celebrities, including singers and actors and prominent African–Americans, primarily women.

> We also cover information having to do with health and food and parenting, fiction is included in the magazine as is poetry, and really anything that is of interest to black women. Tr. 471–72.

While Lewis said that "[f]rom the very first issue of the magazine we have always had a close association and highlighted many entertainers, many artists and the upcoming artists," and Taylor said that "entertainment is an important aspect of the magazine," Tr. 362, 372, their testimony viewed in context accurately described the far more broad reach and variety of the Magazine's subject matter, as does examination of the copies of the Magazine in evidence.

The breadth of that subject matter is also reflected in the flier which ECI displays at supermarkets and other retail outlets to promote subscriptions. That fold-out, four color brochure (D.Ex. 55), which features reproductions of a number of covers from prior issues, is captioned:

> 7 Ways ESSENCE Helps You To Do Everything Even Better.

That caption is followed by a paragraph of text which reads:

> Let ESSENCE Help You Use Your Own Special Talents And Unique Style To Make Everything You Do Something Special.

The flier then delineates the "7 Ways" the Magazine helps its readers "Do Everything Even Better." The seven areas of interest, each further amplified by its own descriptive paragraph, are: Fashion and Beauty; Contemporary Living; Health & Well–Being; Family & Relationships; Business & Finance; Personalities; and Fantastic Features. The only reference to "entertainment" appears in the text accompanying category 6, "Personalities." That text reads:

> Meet Brothers and Sisters who are re-shaping our world and neighborhoods in politics, business and entertainment.

Thus, in a flier intended to tell perspective subscribers about the Magazine, ECI lists "entertainment" (which includes art forms other than musical entertainment) in a category captioned "personalities," where entertainment exists cheek by jowl with those other heavily populated worlds known as "politics" and "business."

The Magazine's present masthead lists Susan L. Taylor as Editor–In–Chief. The masthead identifies the following editorships in capital letters: EDITOR; ART DIRECTOR; MANAGING EDITOR; EXECUTIVE EDITOR; FASHION EDITOR; BEAUTY AND COVER EDITOR; and CONTEMPORARY LIVING EDITOR. The editor whose responsibilities include entertainment is listed on the masthead in upper and lower case, as "Senior Editor, Arts." There is no music editor or entertainment editor. The tables of contents in recent issues list articles appearing under five captions in red letters: Features, Beauty, Fashion, Contemporary Living, and Departments. The regular "Departments" in the Magazine which appear monthly are: Letters; Health; Interiors; Brothers; People; In the Spirit (editorial comment of an inspirational nature written by Ms. Taylor), Shop, Graffiti (brief paragraphs dealing with gift ideas, schedules of current events, and the like), Horoscope, and Back Talk (essays contributed by

prominent black citizens on issues of current concern).

For trial purposes ECI culled from past issues of the Magazine articles about musical entertainers, and advertisements placed by companies in the entertainment business. For example, D.Ex. 72 is "a compilation of entertainment advertisements that have appeared in ESSENCE magazines for the years 1989, 1990 and 1991." Testimony of Clarence O. Smith, ECI's president and co-founder, at Tr. 706. The compilation was impressively thick; but cross-examination developed that the approximately 40 pages of entertainment business advertising appearing in the Magazine during those years, which comprised the exhibit, represented about 4.4 percent of the approximately 900 advertising pages which appeared during those years. Tr. 799–800.

I find, in summary, that ESSENCE Magazine gives considerable coverage to the world of entertainment in general and to black entertainers in particular, as did the ESSENCE television program when it was being shown. That coverage reflects the sound journalistic proposition that entertainers are entertaining. However, the Magazine, "full service" as it is, covers a broad range of personalities and subjects, and cannot by any objective measurement be regarded as predominantly concerned with entertainment, musical entertainment, or entertainers, or even emphasizing those subjects to the extent that others are slighted.

The trial evidence militates against a finding of proximity of product, even if I accept for present purposes ECI's contention, articulated by Taylor at Tr. 537, that "the primary audience for [Hutchinson's] music is the same audience that Essence Magazine targets and serves."[7] The Second Circuit has said that the factor of proximity of products is "perhaps more accurately described as 'competitive proximity.'" *Centaur Communications, Lim-*

*ited v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1226 (2d Cir.1987). In *Centaur* "competitive proximity" was held to exist between two magazines, one primarily concerned with marketing news in American and the other with marketing news in Britain, because "[b]oth magazines are high quality weekly publications concerned with marketing news," so that "consumers in the market interested in American marketing news might assume that Centaur had decided to launch a different magazine primarily concerned with that topic." *Ibid.* In those circumstances, the Second Circuit found that competitive proximity existed between the two magazines. Competitive proximity, which "should be measured, in part, with reference to the first two *Polaroid* factors," *Centaur* at 1226, is relevant "primarily insofar as it bears on the likelihood that customers may be confused as to the *source* of the products rather than as to the products themselves." *McGregor–Doniger, supra,* at 1134 (emphasis in original), *cited and quoted* in *Centaur* at 1226.

The close proximity of products increases the likelihood of confusion; *Centaur* is a good example. Conversely, where as here the "products" bear no resemblance to each other, the differences between them militate against likelihood of confusion. At least that is so in the case at bar, where ECI has not shown at trial that the editorial content and advertising in the Magazine predominantly relate to musical entertainment.

ECI argues correctly that while differences between the products or services of the senior and junior user may preclude a finding of technical infringement of the senior user's trademark, a claim for unfair competition may still lie if the senior user's use of its mark has acquired a secondary meaning indicative in the public mind of a relationship between its product or services and that of the junior user. ECI cites a number of cases in which the publishers of magazines have, under that theory of

---

**7.** The composition of the audience for rap music in general, and Hutchinson's music in particular, is disputed by the parties. Plaintiffs contend that there is a significant and growing white audience for rap music; and Hutchinson does not think of herself as a performer for black audiences only. This issue is discussed further under the analysis of "actual confusion," *infra.*

trademark infringement, obtained injunctions against defendants whose conduct did not involve magazine publishing. These cases stand for the proposition, ECI argues, that the owner of a magazine trademark may object "to the use of a similar mark for goods related to the editorial content and advertising of the magazine." Brief at 29. ECI places primary reliance upon *Esquire, Inc. v. Maira,* 101 F.Supp. 398 (E.D.Pa.1951), and also cites, among other cases, the Second Circuit's opinion in *Triangle Publications, Inc. v. Rorhlich,* 167 F.2d 969 (2d Cir.1948).

In this regard as in most others, trademark infringement cases are fact-specific. The plaintiff in *Esquire* published "Esquire" magazine. It sought to enjoin defendant from using the name "Esquire" in connection with a men's clothing store. The district court found that plaintiff published "Esquire," subtitled "The Magazine for Men," and also a trade magazine called "Esquire's Apparel Arts." 10 to 20% of the editorial content of the magazine was devoted to men's fashion. Wearing apparel advertising in the magazine ranged from a high of 47.42% in one year to a low of 30.49% in another. The magazine had acquired a reputation as "an authority on men's fashions." 101 F.Supp. at 400. As an adjunct to its magazines the publisher did promotional work in men's wearing apparel and accessories, which included supplying clothing manufacturers who advertised in "Esquire" with window display cards with their ads affixed to them which the manufacturers sent to retail customers for display in store windows ("You Saw It In Esquire"), accompanied by a reproduction "of the familiar dapper, bulbous-eyed little gentlemen called 'Esky,' who appears on the cover of 'Esquire' Magazine." The plaintiff publisher also prepared comparable tags for advertisers to place on their apparel products; window display material for retail stores; and mats for advertising for use in local newspapers. The tie-in of all this promotion work with "Esquire" magazine, the district court found, "has helped to introduce new fashions, styles, trends and ideas in the field of men's apparel." *Ibid.*

In these circumstances the court concluded, not surprisingly, that the use of the word "Esquire" in connection with a men's clothing store gave rise to the probability that a false belief that "defendant's store has been approved, endorsed or sponsored by the plaintiff" would be generated. *Id.* at 402.

In *Triangle Publications,* plaintiff published a girl's magazine entitled "Seventeen." Defendants adopted "Ms. Seventeen Foundations Co." as a partnership name under which to make and sell girdles and "Ms. Seventeen" as the trademark for those girdles. The Second Circuit affirmed the holding of the district court that "the public was likely to attribute the use of 'Seventeen' in connection with sales of teen-age merchandise to the plaintiff as a source of sponsorship." 167 F.2d at 971. In reaching that conclusion, the court of appeals cited the following findings by the district court: "Seventeen" magazine had become "an important medium for advertising teen-age apparel and accessories;" by the time defendants formed their partnership "a large proportion of the user's of teen-age apparel had acquired a belief that articles, including girdles, advertised in or mentioned editorially by the magazine had an added desirability;" and the magazine

had played an important part in the merchandising of teen-age apparel in various ways, such as by conferences with manufacturers, editorial fashion comments, sales to manufacturers and merchandisers of reprints, counter-cards and blow ups of its comments and of advertising, monthly bulletins advising merchandisers how to tie in with forthcoming issues of the magazine, and by aiding merchandisers in arranging window displays and departmental displays. *Ibid.*

In the case at bar, there is no evidence that ECI, directly or by promotional tie ins, has participated in the merchandising of music or musical entertainers. There is no evidence, for example, of ESSENCE or "ESSENCE Award" stickers or tags being placed on musical recordings or video tapes. As for the *Esquire* case, the editorial and advertising content

of ESSENCE Magazine in respect of musical entertainers is minimal when contrasted with "Esquire" magazine and the world of men's apparel.

Cases such as these are pertinent, but chiefly to demonstrate the difference between their facts and those at bar.

The factor of product proximity favors plaintiff.

### Bridging the Gap

The term "bridging the gap" reflects the senior user's interest "in preserving avenues of expansion and entering into related fields." *C.L.A.S.S. Promotions, supra,* at 18. The factor militates in favor of the likelihood of confusion "if, in a case where there are certain product differences, the senior user of a trademark proves an intent to expand its traditional activities and enter into a related field occupied by the junior user." *Inc., supra,* at 385.

Logically enough, "bridging the gap" by the junior user should also be considered. "Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 354 (9th Cir.1979).

There is no evidence that ECI intends to expand its business into the areas of performing rap music or sponsoring or promoting rap performers. ECI's only licensing agreement having anything to do with musical entertainment is the license extended to the rock music group, RARE ESSENCE; and that license is specifically limited to apparel such as T–Shirts and related merchandise.

ECI's witnesses also testified that the company was giving consideration to re-entering the field of television programming; but there are no concrete plans or proposals, and at present the return of the ESSENCE name to the television airwaves is conjectural, rather than imminent.

With respect to reverse bridging the gap, it must be recognized that if Hutchinson succeeds as a rap singer, she will almost inevitably seek to market T-shirts and other merchandise at concerts, and to appear in video taped musical performances such as those appearing on television over channels like MTV. All successful performers pursue these additional avenues of marketing. To that extent, reverse bridging the gap favors ECI to a degree; but the degree is relatively slight. That is because of the absence of the ESSENCE name from television since 1988, combined with no present plans of any substance for its return to the medium; and also because should Hutchinson in the future copy the trade dress with which ECI surrounds its ESSENCE mark, such as the distinctive logo (of an African American woman in profile with distinctively drawn back hair) or otherwise suggest a connection with the Magazine, the resulting heightened likelihood of confusion could be judicially dealt with at that time.

### Actual Confusion

While no evidence of actual confusion is required in order to prove a likelihood of confusion, *Ideal Industries, Inc. v. Gardner Bender, Inc.,* 612 F.2d 1018, 1024 (2d Cir.1979), the trial judge may properly infer from the absence of actual confusion that no likelihood of confusion exists. *McGregor–Doniger, Inc. v. Drizzle, Inc., supra* at 1136, *citing and quoting, Affiliated Hospital Products, Inc. v. Merdel Game Manufacturing Co.,* 513 F.2d 1183, 1188 (2d Cir.1975).

Typically, an infringement plaintiff undertakes to prove actual confusion between its and the defendant's product or services in two ways: anecdotal evidence of particular incidents and market research surveys. ECI offers evidence in both categories.

### (a) Anecdotal Evidence

ECI relies upon testimony from three sources: the trial testimony of plaintiff Hutchinson herself, and the deposition testimony of Gary Harris, the Giant Records executive who signed Hutchinson to a contract with Giant, and Anthony Johnson, president of the RARE ESSENCE Corporation and responsible for that musi-

cal group's bookings. ECI's counsel argued in summation that in the testimony of these three witnesses, "[w]e have three instances of [actual confusion] in a very very short period," which he characterized as "very, very powerful evidence indeed of confusion." Tr. 907.

Hutchinson's testimony which ECI cites as evidence of actual confusion emerged at the end of her cross-examination:

Q. When you have been introduced to people as Essence, have you been asked whether you had anything to do with Essence Magazine?

A. No.

Q. You never have been asked that?

A. No.

Tr. 298.

Counsel for ECI then confronted Hutchinson with the following testimony from her examination before trial:

"Q. When you started to use the name Essence, did anyone ask you if it had anything to do with Essence Magazine?

A. If it had anything to do with Essence Magazine.

Q. Yes.

A. Yes. If I was ever introduced the first time, yes."

Do you remember giving that testimony?

A. Can I see it?

Q. Sure.

A. (Pause)

Okay.

Q. Do you remember giving that testimony?

A. Yes.

Tr. 299.

Counsel for plaintiff turned to that subject at the beginning of his re-direct examination:

Q. Ms. Hutchinson, part of your deposition testimony that Mr. Hoffman was just asking you about, when people asked you whether you were in any way connected with Essence Magazine, can you describe it?

Were your thinking of any particular conversation?

A. Well, when I was asked my name I would say MC Essence or Essence, and they would say, Like the magazine? It's a question of pronunciation of the word that I said.

Q. Did they ever ask you anything about whether you worked with or were associated with the magazine in any way?

A. No.

Tr. 300.

This testimony, particularly that elicited during the examination before trial, is not entirely clear: as, for example, the response: "If I was ever introduced the first time, yes." The most I can make of this testimony is that some people, in conversations with Hutchinson, mentioned ESSENCE Magazine. However, during Hutchinson's examination before trial counsel for ECI apparently did not pursue any details about these conversations: who the people conversing with Hutchinson were, where, when, or in what circumstances. This lack of detail dilutes the probative value of the evidence as demonstrating actual confusion. *Compare Lobo Enterprises, Inc. v. Tunnel, Inc., supra* at 74–75, 77 (in absence of detail concerning declarants and in the circumstances of their declarations, "only sheer speculation" would permit an inference of actual confusion). On the other side of the equation, Hutchinson testified that no one asked her whether she worked with or was associated with ESSENCE Magazine in any way. I found Hutchinson to be a credible witness and accept that testimony.

The second anecdotal instance of actual confusion relied upon by ECI is said to lie in Harris's deposition testimony at Tr. 70. Harris said that Saddler came to see him and played Hutchinson's demonstration recordings, which Harris liked. He then testified:

Q. Did he tell you her name?

A. Yes.

Q. Did he tell you her name was Essence?

A. Yes.

Q. Did Essence magazine come into your mind?

Q. What do you mean?

Q. Did you think about Essence magazine when you were told her name was Essence?

A. Oh, yeah.

Dep.Tr. 70.

ECI relies on laconic response.

Harris' testimony continued:

Q. Has anyone ever asked you whether the singer Essence was associated with or connected with Essence magazine?

A. Anyone like who?

Q. Anybody?

A. I don't think so.

Q. I mean any member of the public?

A. I don't think so.

Q. Any member of the trade?

A. No.

Q. Has anyone ever said to you that they thought she was associated with Essence magazine or connected with it?

A. I don't think so.

Dep.Tr. 70–71.

While plaintiff's stage name ESSENCE caused Harris to "think about" ESSENCE Magazine, the content or direction of that thought were not further explored; and no member of the public or trade asked Harris (who was promoting Hutchinson) whether the singer was associated or connected with the Magazine. This is not compelling evidence of actual confusion.

As for Johnson, the RARE ESSENCE singing group's executive, he testified at deposition that in March 1991 he saw a copy of Billboard Magazine containing an advertisement for "New Jack City" which included the singer ESSENCE as a performer. Johnson telephoned his attorney to inquire "if ESSENCE Magazine had anything to do with the rap artist," because "they have the exact same name, so I thought maybe that they sponsored them." Tr. 73. That is some anecdotal evidence of actual confusion on Johnson's part, but it significantly diluted by the fact that he had been engaged in prolonged negotiations with ECI with respect to the RARE ESSENCE license at the time he saw the advertisement in question. Johnson testi-

fied that "to a certain extent" his negotiation with the magazine was a factor in his concluding that there might be a connection between the magazine and the singer. Prior to entering into a license agreement with RARE ESSENCE, ECI pursued the music group with the threat of an infringement action. In those circumstances, Johnson testified: "because by the name Essence being Essence, I figured that you all had something to do with her when you came after us for having RARE ESSENCE. We had to put stipulations on, you know, using RARE ESSENCE, so I figured ESSENCE was your rapper or your artist." Dep.Tr. 75.

Given this unique set of circumstances, Johnson cannot be regarded as a typical consumer of Hutchinson's product.

In contrast to this rather frail collection of anecdotes of actual confusion, one must consider the fact that neither Taylor, nor Lewis, nor any witness associated with ECI testified to any expression of actual confusion articulated by a reader or advertiser in the Magazine, or a consumer of rap music, communicated to ECI directly or indirectly through the sensitive and interlocking media and entertainment networks. ECI argues that this lack of evidence of actual confusion is not probative because so little time had elapsed between the release of the movie "New Jack City" and its sound track (Hutchinson's first public performance of any consequence) and the commencement of trial. I do not find that argument wholly persuasive. The movie "New Jack City" was first released in late February 1991. It was an instant box office success. As noted elsewhere in this opinion, the soundtrack quickly went to the head of the charts. Hutchinson, using the stage name ESSENCE, was identified as a performer, both in the movie credits and in the printed material accompanying the soundtrack record and cassette. Indeed, it was at a showing of the movie that the ire of Lewis was first aroused. Almost four months (beginning of March to the commencement of trial at the end of June) is a sufficient period of time to lend some probative force to the fact that nobody con-

tacted ECI or the staff of ESSENCE Magazine to inquire as to whether the singer ESSENCE had any association with, or was promoted or sponsored by, ESSENCE Magazine.

This absence of meaningful anecdotal evidence of actual confusion weighs in Hutchinson's favor. *Compare Information Clearing House v. Find Magazine*, 492 F.Supp. 147, 160 (S.D.N.Y.1980) (Weinfeld, J.) (absence of consumer testimony and other evidence of actual confusion "invites an adverse inference").

### (b) Survey Evidence

ECI's counsel commissioned Audits & Surveys, Inc. to conduct a survey to determine the percentage of people who, upon hearing of the singer ESSENCE, would assume that she was sponsored by, promoted by or otherwise associated with the magazine. The survey's findings and methodology were detailed at trial by Dexter Neadle, the company's vice-president and director of surveys; the accuracy of the survey's tabulations was challenged at trial by plaintiffs' counsel and subsequently defended by Frederick Nicholson, also a vice-president of Audits & Surveys.

■ Surveys are admissible evidence to establish the existence of confusion or the likelihood of confusion in the minds of consumers. *Universal City Studios v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984); *Inc., supra* at 390; *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F.Supp. 1189, 1204–5 (E.D.N.Y.1983). To be probative, however, "[t]he survey must ... have been fairly prepared and its results directed to the relevant issues." *Universal City Studios, Inc. v. Nintendo Co., Ltd., supra*, at 118, citing and quoting *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*, 532 F.Supp. 651, 657 (W.D.Wash.1982). In *Toys R Us, Inc., supra*, Judge Glasser outlined the following criteria for assessing a survey:

> The trustworthiness of surveys depends upon foundation evidence that (1) the universe was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) objectivity of the entire process was assured. Failure to satisfy one or more of these criteria may lead to exclusion of the survey.

559 F.Supp. at 1205.

At trial, plaintiffs objected strenuously to the admission of defendant's survey, challenging it as unreliable on a number of the above grounds. However, because the trial was not before a jury, I followed the approach adopted by Judge Glasser in *Toys R Us, Inc., supra*, and by myself in *Inc. Publishing Corp., supra*. I admitted the evidence, but will now determine how much weight, if any, it merits.

Plaintiffs object to the survey on four grounds: they allege that the universe was improperly defined, that the questions were leading, that sound interviewing methods were not followed, and that the data was inaccurately reported. As a result, plaintiffs argue that the findings of the survey are entitled to little or no weight. Before detailing these objections, however, it is important to note how the survey was conducted.

According to defendant's expert, the survey was designed to determine whether and how extensively blacks associated the singer ESSENCE with the magazine. Neadle testified at trial that:

> [t]he purpose of the survey was to determine the extent, if any, that African–Americans assume an association between a singer named Essence and Essence Magazine.

Tr. 9. Secondary goals of the survey were to measure the extent of the name recognition of ESSENCE magazine among black Americans and to ascertain the percentage of blacks who actually purchase or listen to rap music.

The interviews were "intercept" interviews, conducted at shopping malls, movie theatres, restaurants and other similar locales in five different cities.[8] Tr. 57. No instruction was given to the interviewers to conduct the interviews near or at record stores, and no effort was made to target people in a music-buying mode. Nor were the interviewers directed to refrain from questioning people at or near newsstands. *Id.*

Needle selected the universe, relying on ECI's attorneys' representations that ESSENCE Magazine was sold primarily to black women and that blacks constitute the primary market for rap music. Tr. 13. The written instructions given to the interviewers contained the following directive: "To be eligible to be interviewed, the respondent must be Black and must be 13–44 years old." Defendant's Exhibit 3C. Consistent with that instruction, all of the people interviewed were black; no whites were interviewed. According to the explanatory report accompanying the survey, "[t]his [universe] was selected because they were considered to be likely purchasers of rap music and also be familiar with *Essence* magazine...." Defendant's Ex. 3 at 1. Needle testified that he had intended to capture that section of the population which consumes both products. The cities selected for interviews were chosen because of their concentration of black Americans, and the particular locales in those cities were further selected because of the high black traffic they receive.[9] The interviewers too were black.[10] Tr. 29. Plaintiffs challenge the validity of the selected universe.

They also challenge the survey itself. The survey consisted of twelve questions. The first question was designed to determine the interviewee's age; if he or she was not in the targeted age group, that interview was terminated. The second question asked whether the respondent had

ever heard of a singer called "Essence." Regardless of the interviewee's answer to that question, he or she was then asked the third question. It is that question which forms the core of plaintiffs' challenge to the survey. Question 3 reads:

> Though you may or may not have heard of this singer named Essence, who or what do you believe is associated with her, or promotes or sponsors Essence?

The interviewers were instructed to "RECORD [respondent's] EXACT ANSWER." Defendant's Ex. 3A. If the interviewee made any association between the singer and any other entity or product, he or she was then asked question 4, which read simply: "Why do you think so?" Again the interviewers were instruct to "RECORD EXACT ANSWER." These two questions are the most critical.

The next six questions were asked of all the people interviewed. In question 5, people were asked whether they listened to rap music and, in question 6, they were asked whether they ever bought any rap music. Question 7 asked them whether they had ever heard of ESSENCE Magazine and, if that answer was affirmative, they were asked whether they ever "read or looked through ESSENCE magazine" and whether they read the magazine "regularly, occasionally or hardly ever?" The interviews concluded by asking the interviewees which age group they fell into and for their name and phone number. In total, 506 interviews took place over three days; of the people interviewed, half were men and half were women.

Two versions of the results were tabulated. The first set of calculations produced Defendant's Exhibit 2; those numbers were then recalculated, resulting in Defendant's Exhibit 3. These two reports differ only in the way in which the numbers were computed. Needle testified that in Exhibit 2, questions 3 and 4 were "word coded"— meaning that they were analyzed separate-

---

**8.** The cities were Chicago, Los Angeles, Montgomery, Philadelphia and Washington, D.C.

**9.** Although New York City is both the corporate home of ECI and the city in which rap music developed, no interviews were conducted here.

The witness explained that, given the short time frame for conducting the survey, New York City was not logistically feasible.

**10.** In fact, all but two were. These two interviewers filled in on an emergency basis.

ly from each other. In other words, a respondent's answer to the question of who promoted the singer (question 3) was placed in a particular category (such as "The Magazine" or "New Jack City") and then, entirely separately from that, his or her answer to question 4 was categorized. After this process was completed, the association between the singer and the magazine was analyzed: 58 people were found to have assumed some relationship between the two.

The compiled statistics were then reviewed by counsel for ECI. Needle testified that, after consulting with ECI's attorneys, he:

> felt that in some instances the true or full meaning of the responses had not been captured by the individual question coding, so an additional coding was added called—or generally known as concept coding.

Tr. 37. *See* Tr. 95 (Needle describes his conversations with defense counsel after they received Exhibit 2, but before Exhibit 3 was created.)

These same results were then "concept coded" and compiled in Exhibit 3. There, rather than analyzing the answers to questions 3 and 4 separately, the two answers were read in conjunction with each other. As Needle explained, "the respondent's full answer to questions 3 and 4 [were] treated ... as a unit rather than as two separate things...." Tr. 37. One of the questionnaires, which is labelled as Defendant's Exhibit 100, demonstrates the effect of concept coding. In response to question 3, that respondent answered that he or she assumed that "Johnson & Johnson" sponsored the singer. T. at 44. To question 4, the same respondent answered that they believed Johnson & Johnson sponsored the singer "because they publish Essence magazine." *Id.* The concept-coded answer was categorized as making an association between the singer and the magazine.

As a result of the concept coding, the percentage of the consumers interviewed who assumed an association between the singer and the magazine increased. In Exhibit 2, 58 of the 506 people interviewed were reported as believing that the two were related to each other (Ex. 2); according to concept-coded Exhibit 3, 67 people made that association (Tr. 81). Needle testified, without contradiction, that concept-coding is a long-established, oft-used analytical tool. Tr. 49.

With respect to the contested questions, the written report based on the survey reads:

> Over 13% of all respondents identify *Essence* Magazine as being associated with, promoting or sponsoring Essence (the singer). Furthermore, of those who make any association with the singer (185 respondents), over one in three (36%) identify her with *Essence* Magazine.

### Table A

### Identification with Essence Magazine

| | |
|---|---|
| All respondents (506) | 13.2% |
| Respondents who make any association (185) | 36.2% |

Exhibit 3 at 4.

In short, the survey shows that a percentage of people, significant enough not to be ignored, associated the singer Essence with the magazine of the same name. The question is how much weight, if any, that survey is entitled to receive. That question can be answered only by reference to the seven factors discussed above.

### *The Universe*

The universe of the survey, as discussed above, was defined by defendant as the consumers of both products (ESSENCE Magazine and rap music). That universe was approximated by interviewing 253 black men and 253 black women. Exhibit 3 at 2. This universe is flawed in two critical respects. First, it is improperly defined. Second, the pool of the people interviewed does not adequately reflect the correctly-defined universe.

The issue at bar is whether consumers of rap music will be confused as to the source of plaintiffs' product. The proper universe thus is those people who listen to or buy rap music. It is not those people who read or know of ESSENCE Magazine. Defendant should have surveyed those people

who buy or listen to rap music. The universe, as drawn by defendant, was not the correct universe.

■ It is well-settled in this circuit that the universe of the survey must include potential purchasers of the junior user's product. The Second Circuit has long adhered to the principle that "[t]o be probative and meaningful ... surveys ... must rely upon potential consumers of the products in question." *Universal City Studios, Inc. v. Nintendo Co., Ltd., supra,* 746 F.2d at 118, citing and quoting *Dreyfus Fund Inc. v. Royal Bank of Canada,* 525 F.Supp. 1108, 1116 (S.D.N.Y.1981). In cases where the products are of the same type, the relevant market is the consumers of both products. The issue is murkier, however, in cases like the one at bar, where the products are fundamentally different. A magazine is not singer; nor is a consumer of a magazine necessarily a consumer of music, or vice-versa.

Likewise, video games are not classic films or their modern re-makes; in that respect, the *Universal City Studios* case is comparable to this one. There, the Second Circuit held that plaintiff was not entitled to rely on a survey whose universe was fatally flawed. That survey targeted only the consumers of the junior user's goods. However, the only flaw identified by the court was that all the interviewees had already purchased defendant's allegedly infringing video game. The court held that the relevant market was those consumers who would purchase the defendant's goods, and thus that only potential (not past) purchasers should have been interviewed in the survey. The implication of the holding is that a survey should measure whether those people who are likely to buy the junior user's product will be confused or misled. That was not done in this case.

In a similar case, the Seventh Circuit was presented with the question of whether a restaurant named "Sign of the Beefeater" infringed plaintiff's trademark of "Beefeater" for gin. *James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266 (7th Cir.1976). That case is similar to the one at bar in at least one significant respect: gin

and restaurants—like singers and magazines—are not the same (although the difference at bar is arguably greater, given the judicially noticeable consumption of gin at restaurants). As in this case, the senior user commissioned a survey to determine the likelihood of confusion. The people surveyed all lived within a five mile radius of a proposed new "Sign of the Beefeater" restaurant. The court then looked at the percentage of "the restaurant-going public" who mistakenly associated the restaurant with the gin. *Id.* at 279. Finding that that number (15%) was significant, the court held for plaintiff. The court never considered the percentage of gin-drinkers (the analogue to readers of ESSENCE Magazine) who were misled. These cases suggest that the relevant market is the consumers of the junior user's product and that the universe of the survey must adequately reflect that market.

■ Having determined that the universe for defendant's survey should have been rap music consumers, the next question is whether the people selected for interview adequately represents that universe. They do not. Much of the trial testimony focused on the extent to which whites—who were not represented in the survey—are buyers and listeners of rap. If whites are significant consumers of rap, then their total exclusion from the survey means that the survey's universe failed to reflect fully the consumers of plaintiffs' product.

A battle of experts ensued at trial. Each side presented a music expert who testified, more or less in that party's interest, on the degree to which rap music has "crossed over"—that is, the extent to which it appeals to white audiences. Plaintiffs' expert was Paul Grien, a reporter for Billboard Magazine. He authors such columns as "ChartBeat," the sole purpose of which is to chronicle and analyze the music charts published in Billboard. He stated that he studies or reviews about thirty music charts a week and was able, on cross examination, to enumerate those thirty. Tr. 180; Tr. 213. Grien was qualified as an

expert on music trends and the demographics of music audiences. Tr. 186.

Defendant presented George Ware as its expert witness. Ware established and currently heads Universal World Communications, which assists new and developing artists; there, he works primarily with black performers. Tr. 614. Prior to that, Ware had been a director of the Black Music Association ("BMA"). Tr. 621. Since leaving BMA, he does not study music trends and charts professionally, but attempts to "keep abreast of the status of black music in America." Tr. 626. He was qualified as an expert in the fields of black music generally and rap music specifically. Tr. 617. Both witnesses were credible and forthcoming in their testimony.

What emerged from their testimony is that rap music has its roots solidly in black music and remains particularly popular among blacks. Ware testified that rap music initially emerged from the Harlem World Disco in the mid–1970s.[11] Despite its earliest roots in the black inner city, rap music has crossed-over to white audiences, although Ware and Grien disagreed over the degree to which it has done so. Nonetheless, certain facts became clear during their testimony. On the Billboard charts, 25% of the albums in the top 40 of the "Top Pop Albums" chart were rap albums— which is the same percentage as on the top 40 of the "Top R & B [Rhythms & Blues] Albums" chart. Plaintiff's S Ex. at 86. This comparison is a significant indicator of cross-over, for the two charts measure racially different audiences. The Top Pop Albums chart is compiled from sales in record stores throughout the country, without any focus on blacks; the R & B chart is compiled almost exclusively from sales in record stores located in black neighborhoods. Tr. 221. That rap music is equally well represented on both charts means that people who frequent music stores in neighborhoods other than black neighborhoods

buy rap music at least as much as people who go to records stores in black neighborhoods. These statistics are at least circumstantial evidence of cross-over.

Grien further highlighted the stunning success of the group N.W.A. as showing that even hard-core rap is crossing over to white audiences. He testified that N.W.A. stands for "Niggers with Attitude" and that the name of their hot new album is "Niggaz4life"; according to Grien, these names reflect the style of N.W.A.'s music, which has no "pop" music appeal. Tr. 189. Their album, however, hit the Top Pop Albums in the number 2 position and went to the number 1 position the next week. *Id.* Grien concluded that the album's success was necessarily attributable, at least in part, to its appeal to white audiences. Tr. 189, 190.

Ware had a distinctly different interpretation of N.W.A.'s success. Like Grien, he characterized their music as provocative and hard-core "to the extreme." Tr. 667. Ware testified that he felt that N.W.A. had not crossed over to white audiences. *Id.* When queried why he remained dubious in light of the success of N.W.A.'s album, Ware stated that he would not believe cross-over until the album had remained on the chart for a significant period time without dropping. Tr. 668. Until then, the album's success could be attributable to blacks going out and buying the album in one sudden rush upon its release. *Id.* As of the time of trial, N.W.A. was in the number 3 position on the charts—hardly indicative of the plummet that would be consistent with Ware's testimony. Plaintiff Ex. S at 86. Having heard both explanations, Grien's seems more accurate.

Instead of denying the possibility of cross-over, Ware identified only the limited circumstances in which he believed it could happen. Three types of rap performers, according to him, can develop white audiences: those who are white, those black

---

11. Ware's testimony was bolstered by the testimony of plaintiff Saddler. Saddler—truly a giant of the genre—testified that he began rapping in the black neighborhoods of New York in the early 1970s. Tr. 304. On the other hand, Saddler also provided evidence that rap music began appealing to non-blacks early in its development. He testified that his concert tour for his album *The Message*, which was released in 1983 (Tr. 343) travelled throughout the United States, Europe and Japan (Tr. 311)—which is indicative of success beyond black audiences.

rappers who become well-established in the black community, and some new artists with a new sound. Tr. 635–637. The majority of rappers, he testified, will never become famous or develop a white following. Tr. 640.

Grien, on the other hand, looked at the tremendous success of the top rap performers. Based on that, he concluded that whites buy rap music in quantity; for a mega-star such as M.C. Hammer, the majority of his albums sell to whites. Tr. 240. The thrust of Grien's testimony was that their success is indicative of the phenomenon of cross-over. This point is consistent with Ware's observation that the success of the superstars paves the way for those performers who follow. Tr. 638. In other words, once a music fan who listened to and enjoyed rappers like M.C. Hammer (black) or Vanilla Ice (white), he or she will then be inclined to branch out into other rappers. Grien testified that the majority of purchasers of rap albums are white. Tr. 263.

The crux of Grien's testimony—that whites constitute significant consumers of rap music—is supported by other evidence at trial. The most straightforward, significant other evidence on this question was the Simmons Market Reports ("Simmons reports"), admissible under 803(17), Fed. R.Evid. That rule includes as an exception to the hearsay rule:

> Market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations.

*Id.* Dexter Neadle characterized the Simmons reports as reliable information on which experts rely (Tr. 11); Clarence Smith also laid a foundation for the admission of the reports when he testified that he routinely relies on the reports in the course of his business. Tr. 714–715. But I need not accept that hypothetical argument to conclude, as I do, that the total exclusion of whites from the survey flaws the universe.

According to defendant's Exhibit 1a, entitled Simmons 1990 Study of Media & Markets, as interpreted at trial by Smith, 77.2% of all people who buy rap music are white, whereas only 20.5% of rap buyers are black. Exhibit 1a (chart labelled "Records, Discs, & Tapes: Kind). A higher percentage of black Americans buy rap than do white Americans; according to Smith, of the whites who buy music, only 3.8% buy rap, whereas 7.6% of black music purchasers buy rap. In sum, while it is true that a higher percentage of blacks buy rap, rap is—in terms of the sheer volume of sales—sold to far more whites than to blacks. To represent the universe of purchasers of rap music adequately, defendant's survey should have included whites; arguably, close to 80% of all the people polled should have been white.

Much testimony was also introduced about the success of the album and movie "New Jack City". Plaintiff introduced Exhibit S, which is the June 29, 1991 issue of Billboard magazine; the court's attention was specifically directed to page 86, which is the Top Pop Albums chart. On that chart, Grien had circled all of the rap albums. Tr. 198–199. One of the items circled is the soundtrack for "New Jack City", which was then in the eleventh position. According to that chart, the soundtrack had been in the ninth position one week prior, in the seventh position two weeks earlier, and had been on the chart for 15 weeks altogether. *See also* Tr. 201 (Grien).

Testimony showed, too, that the movie itself was very successful. Gary Harris, the A & R representative of Giant Records who initially discovered and signed Hutchinson, testified by deposition about the market for "New Jack City". In the first week of its release, the "New Jack City" film was the second grossing films of all films playing that week. Harris transcript at 160 ("H.Tr."). This success is one reason why Harris stated that he believed that the movie appealed to a general market, rather than to just a black market. H.Tr. 110, 159–160. As he argued, when a Steven Spielberg movie reaches the first position on the charts, it is not seen as being an exclusively white movie (H.Tr. 161); according to him, it would be equally incorrect to characterize "New Jack City" as a

black film. H.Tr. 159–161. He testified that "[i]t would be virtually impossible to be—to have that amount of success if it were just black teenagers going to see it." H.T. 161.

In terms of the general market for rap, I conclude that rap music undoubtedly has its primary roots in the black community. It is equally true that it also has a substantial appeal to whites. It can safely be said (as does the Simmons report) that any one black is more likely to buy rap than is any one white, but that more whites buy rap than do blacks. A survey intending to reach the consumers of rap music must address whites.

However, the issue here is really more narrow than identifying the appeal of rap music generally. The fundamental question is what the market for plaintiffs' music is, because this court must determine whether the consumers of Hutchinson's music are likely to be confused. Hutchinson testified that she aimed her music at "the whole entire world." Tr. 287. Her intended market includes blacks, whites and everyone else. These, however, are plaintiff's dreams and aspirations; no matter how laudable, they may not reflect the reality of her career.

Ware was the only witness to address directly the question of the audience for Hutchinson's music. In response to that direct question, he stated that he believed her primary appeal was to blacks generally and to black women particularly. Tr. 647. He testified that he did not believe that Hutchinson fell into any of the three categories of artists with high cross-over potential; he further stated that her musical style is what he termed "typical New York rap style" and thus would not appeal to whites. *Id.* He dismissed the argument that the success of "New Jack City" (both the soundtrack and the film) was indicative of Hutchinson's potential. Tr. 648.

Ware's analysis, however, was weakened on cross-examination. Ware testified that M.C. Hammer crossed-over as successfully as he did in part because he is a dancer. Tr. 638. Plaintiffs' counsel, on cross-exam-

ination, had the following colloquy with Ware:

Q. Now, you had also testified that one of the reasons for MC Hammer's cross over appeal is that he's primarily a dancer. Is that correct?

A. I said that.

Q. Have you ever seen Ms. Hutchinson perform?

A. No, I haven't.

Q. Have you ever seen a video performance of Ms. Hutchinson?

A. No, I haven't.

Q. Do you know if her dancing is a principal part of her performance?

A. I have never seen it nor am I aware of it. I have only listened to the songs and read the lyrics. That is the extent of my knowledge.

Q. So if you had seen Ms. Hutchinson perform, your opinion might have been different?

A. I don't know.

Tr. 675–676.

There is evidence in the record that plaintiff is a dancer: she is trained as a dancer (Tr. 164) she performs with dancers (Tr. 171; H.Tr. 78). Harris, in fact, implied that it was her dancing in addition to her music that made her performance so impressive. H.Tr. 78–79. Thus, to the extent that Ware is correct that M.C. Hammer's cross-over potential was enhanced by his abilities as a dancer, that bolsters plaintiffs' contention that plaintiff stood a chance of appealing to white audiences through her skill as a dancer.

Furthermore, the future of ESSENCE the singer cannot be examined without reference to the impressive success of the movie and soundtrack of "New Jack City". Although Ware testified that he did believe that its success would not help the singer ESSENCE reach a white audience, the people at Giant Records reached (and were banking on) a different result. Carol Fenelon, who is both a lawyer and a business executive at Giant, testified by deposition that the release of ESSENCE's single "Lyrics 2 the Rhythm" was timed so that the popularity of "New Jack City" would carry the song; the hope was that people

who bought "New Jack City" would buy the ESSENCE single upon its release. Fenelon Transcript at 96–98. Harris stated that he believed that ESSENCE's song represented the sound and image of the whole "New Jack City" album and was "indicative of the direction of . . . the project as a whole." H.Tr. 108. The inference that can logically be drawn from this testimony is that ESSENCE's music could be expected to appeal to the same audience that made "New Jack City" so successful—an audience that apparently included whites as well as blacks.

A universe that excluded whites entirely is one which reflects neither the market for rap music generally nor for plaintiffs' music specifically. An all-black universe reflects the readership of the magazine, not the listeners of rap; in effect, the answers rendered by that universe are responding to the question of whether consumers of the *magazine* are likely to be confused. Only if whites are included will the answers reflect whether consumers of rap performers are likely to be confused. It is thus not a proper universe. Given the extensive testimony about the powerful name recognition enjoyed by ESSENCE Magazine amongst blacks, the exclusion of whites was likely to bias the results in favor of the magazine.[12] The survey's conclusion that close to 14% of the people surveyed made an association between the singer and the magazine is not a reliable estimate of the percentage of consumers of plaintiffs' music who are likely to be confused.

### Question 3

■ To be reliable, a survey should not contain leading questions. *See Universal City Studios v. Nintendo, supra,* 746 F.2d at 118; *McDonald's Corp. v. McBagel's, Inc.,* 649 F.Supp. 1268 (S.D.N.Y.1986). This proposition is undisputed. The issue is whether any particular question is leading and, if so, how unreliable it renders the results.

Plaintiffs point to question 3 and argue that it is a leading question. To restate it, it reads:

> Though you may or may not have heard of this singer named Essence, who or what do you believe is associated with her, or promotes or sponsors Essence? Defendant's Ex. 3A.

In effect, the question asks readers to assume that some entity or person sponsors or promotes or is associated with the singer and then asks the interviewee to imagine who that entity or person would most likely be. It does not ask the interviewee whether he or she believes that someone sponsors, promotes or is associated with the singer and, only if so, who that someone is. There thus may be some risk that, in the words of plaintiffs' counsel, it "made people search their minds for associations"—associations that they might otherwise not make. Tr. 828. Dexter Neadle conceded that due to this flaw the question "carries some suggestion" that ESSENCE is actually promoted by someone or something. Tr. 99.

■ This question is not as leading as the question in *Universal City Studios v. Nintendo, supra.* In that case, the Second Circuit refused to consider the survey at all, in part because of the badly defined universe and in part because of the excessively leading question in the survey. That question read:

> To the best of your knowledge, was the Donkey Kong game made with the approval or under the authority of the people who produce the King Kong movies?

*Universal Studios,* 746 F.2d at 118. As Neadle explained in his testimony, an "aided" question is one which suggests the answer to the interviewee and thus is more likely to result an association being made. The Donkey Kong question was an aided question; the question in this survey was not. *See also Inc., Publishing Corp. v. Manhattan Magazine, Inc., supra* at 394

---

12. For example, Neadle testified that people who read the magazine regularly associated it with the singer to a much greater degree than did interviewees who did not read the magazine.

T. at 80. Thus, because whites read the magazine in much smaller numbers than do blacks, the inclusion of whites would likely lower the association made between the two.

(because the critical question in the survey was as leading as the question in *Universal Studios*, the court concluded that it "can have no such confidence in this survey" and found that it had no probative value).

In the *McDonald's v. McBagel's* case, Judge Walker was faced with a survey containing a question identical to this one. It read:

> Though you may not have seen or heard of this restaurant, who do you believe sponsors or promotes McBagel's?

*McDonald's, supra*, 649 F.Supp. 1268. Judge Walker termed that question "leading" but concluded that it did not "fatally infect the survey." *Id.* at 1278.

The Seventh Circuit, in analyzing the same form of question in the Burroughs case, concluded that it was not at all leading. *James Burrough Ltd. v. Sign of the Beefeater, Inc., supra*, 540 F.2d at 278. That question, like this one, asked "Who do you believe is sponsoring or promoting this restaurant." *Id.* The Court concluded that the survey questions "do not appear slanted or leading." *Id.* at 279.

To a certain extent, this case is distinguishable. First, the author of the survey himself conceded that the question was not drafted as well as it could have been. Tr. 99–100. Second, restaurants are often franchises; singers rarely are. Thus, it is more likely that the question did not plant an idea in the minds of the interviewees in the restaurant context than in this context, given the judicially noticeable prevalence of restaurant chains. Third, the problem of the ill-defined universe exacerbates the problem of the leading question. The phenomenal name recognition of ESSENCE Magazine among blacks makes it more likely that when told to associate the singer with something else, the people chosen for interviews would think of the magazine. Thus, while the question is not so egregious as to render the survey worthless, it nonetheless makes the survey's results less reliable.

### Sound Interviewing Techniques

Plaintiffs contend that the survey departed from standard interviewing techniques for two reasons. First, plaintiffs argue that no steps were taken to ensure that people were not interviewed in front of newsstands displaying ESSENCE Magazine. Dexter Neadle conceded that it was "possible" that interviews took place near newsstands and that he "did not believe" instructions *not* to conduct interviews near newsstands were given. Tr. 57. He also testified that if the interviewee could see a copy of ESSENCE Magazine during the interview, "it could have an influence if it was in their sight at the time they were responding to the questions." Tr. 58. On the other hand, plaintiffs proffered no evidence that the interviews were in fact so tainted. Plaintiffs' allegations are not sufficient to result in the survey being disregarded, but do cast further doubt upon it.

### Accurate Reporting of the Data

At trial, it became clear that certain errors were made when the computer actually computed the statistics. None of those errors had an impact upon the conclusions reached. The defendants, during the course of the trial, performed the calculations again and correctly. Plaintiffs have not cast doubt upon that repeated calculation nor upon the accuracy of the remaining computations.

As the survey indicates, some consumers of plaintiffs' music will be confused. The number offered by defendants, however, is not reliable. Plaintiffs have proved what the percentage is not; it is defendant's burden to prove what that number is and that it is statistically significant. They have not met that burden. The survey, while evidence of some actual confusion, is not entitled to significant weight. Coupled with the relative paucity of anecdotal evidence of actual confusion, this factor on balance favors plaintiffs.

### Good Faith

In trademark infringement cases the concept of "good faith" addresses the issue of

whether or not the junior user deliberately copied the senior user's mark, in the illicit hope of "palming off" his product, or in the case of services, creating the impression of an association that does not exist.

■ The junior user's awareness of the senior user's mark "can give rise to an inference of bad faith." *Centaur* at 1228. That inference is bolstered if the junior user, with knowledge of the senior user's mark, "proffered no credible innocent explanation" for its choice of name. *Ibid.* Furthermore, "evidence of intentional copying raises a presumption that a second comer intended to create a confusing similarity of appearance and succeeded...." *Centaur* at 1228, *citing and quoting Warner Bros. v. American Broadcasting Co.,* 720 F.2d 231, 246–47 (2d Cir.1983). *Warner Bros.* also stands for the proposition that if there is no likelihood of confusion, "then intent to copy, even if found from the proffered evidence, would not establish a Lanham Act violation." *Ibid.*

The only evidence of Hutchinson's awareness of ECI's use of the mark ESSENCE appears in her direct examination at trial. Hutchinson testified:

Q. Ms. Hutchinson, did you ever subscribe to Essence Magazine?

A. Yes.

Q. About when did you do that?

A. Maybe a year and a half ago, close to.

Q. Do you still subscribe to Essence Magazine?

A. No.

Q. What happened?

A. Well, I sent in a form that was inside of a magazine that I was looking at in another business and I filled it out, sent it in but I never sent in the money for it, so they stopped sending the magazines.

Tr. 273.

The subject was not pursued further on cross-examination.

■ There was no evidence that Hutchinson was aware of ESSENCE Magazine prior to her discovery of the order form which she found inside a different maga-

zine "maybe a year and a half" prior to her testimony on June 26, 1991. This takes us back in time to December, 1989. The inference of bad faith arising from the junior user's copying of the senior user's mark requires a showing that the junior user's awareness of that mark antedated her own use of it.

Dale Dykes, Hutchinson' manager, testified that while he was hosting a show at the Castle Club in New York City, a rap performer named Euna Benett "gave me a tape with her and Tamara Hutchinson rapping on it as a duo." The duo comprised of Benett and Hutchinson had a stage name: the single word EUNIQUEESSENSE. Dykes received that tape in December, 1989. Dykes listened to the tape, contacted Benett, and said he was interested in managing them. Dykes thereafter came together with Benett, Hutchinson, and Saddler at a recording studio, where Benett and Hutchinson made a demonstration recording. The name the duo used—EUNIQUEESSENSE—resulted from the fact that Euna Benett went by the name "EUNIQUE," and Hutchinson went by the name of "ESSENCE." After a month of recordings, Dykes testified, Benett "had a personal problem and she wasn't going to be in the group anymore." Tr. 108–09. After the duo of EUNIQUEESSENSE broke up, Hutchinson continued as a solo artist, using the name "ESSENCE," with Dykes as her manager. Tr. 107–109.

Hutchinson testified that she and Benett started making demonstration records under the name EUNIQUEESSENSE "close to late '88 or beginning of '89 and broke up in the middle of 1990." Tr. 267. In giving that testimony, on the second day on which she testified, Hutchinson corrected testimony given on the first day, to the effect that she and Benett started the duo EUNIQUEESSENSE in the beginning of 1990 and ended somewhere in the middle or end of that year. I credit Hutchinson's correction as to timing because it is corroborated by Dykes and by Saddler.

It follows that not later than the beginning of 1989, Hutchinson was using the stage name ESSENCE as part of the stage

name for the duo she shared with Benett, who called herself Eunique. This is well before the date of Hutchinson's awareness of ESSENCE Magazine as established by the evidence. A finding that Hutchinson was aware of ESSENCE Magazine before she adopted the stage name ESSENCE would be based only on speculation.[13] Accordingly there is no basis in the record for an inference of bad faith on Hutchinson's part with respect to her selection of that name. Hutchinson gave this explanation of her choice of the stage name ESSENCE:

> Well, once Eunique and I knew that we wanted to become professionals, we knew we had to have a title on me and we knew we wanted it to stand for something so we chose Eunique to mean different, because we were both different, and we chose the name Essence because we are different but we are still real, which means the basic nature of anything or something, so we based that on our title EuniqueEssence.
>
> Tr. 302.

I credit this testimony as well. It is not inherently implausible. On the contrary, Hutchinson's explanation of her choice of the word essence parallels the explanation given by Taylor and Lewis with respect to the naming of ECI's magazine. It is a concept inherent in the meaning of this familiar English word. Indeed, I may judicially notice that the July 21, 1991 edition of the New York Sunday Times included an advertising flier for that popular cosmetic product for men called "Brut," which its manufacturer, Faberge, described in the advertisement as "The Essence of Man."

I find that when Hutchinson chose the stage name "ESSENCE", she did not copy the mark ECI used for its magazine.

The parties exchange accusations of bad faith with respect to conduct relating to the litigation. ECI charges that Hutchinson's counsel, and Hutchinson herself, sought to mislead when they wrote in a letter and an affidavit respectively that Hutchinson "used the stage name of M.C. ESSENCE," and that Dykes altered names appearing on contracts and a photograph from ESSENCE to "M.C. ESSENCE" in a similar effort. The charge of false representation results from the fact that in her limited actual performances, Hutchinson has only used the name ESSENCE.

Plaintiffs, for their part, point out that ECI did not enter into its license agreement with the rock music group RARE ESSENCE until after plaintiff commenced this litigation. Plaintiffs regard that timing as indicative of a transparent tactical effort by ECI to preempt a stage name which Hutchinson was legitimately using.

These counter-charges of post-litigation bad faith amount to very little. The letter of plaintiffs' counsel and Hutchinson's affidavit, clearly prepared by counsel, may fairly be criticized in their inclusion of the word "used" in relation to the stage name M.C. ESSENCE, although with Dyke's assistance Hutchinson had registered that business name with New York County authorities. The more basic point, however, is that litigation steps cast no light whatsoever upon the more significant question of whether Hutchinson acted in bad faith at the time she chose the stage name ESSENCE. For the reasons stated, I have answered that question in the negative.

As for ECI's dealings with the RARE ESSENCE musical group, the evidence shows that ECI was engaged in serious licensing negotiations before plaintiffs began this action. However, the timing of the final agreement has about it a faint whiff of suspicion.

My conclusions, however, are that Hutchinson acted in good faith in selecting the stage name ESSENCE; and that no subse-

---

**13.** Hutchinson also addressed this issue in responding to questions of the Court:

> The Court: Ms. Hutchinson, when did you decide to take the word Essence as your professional name?
>
> The Witness: I first decided when I was in the group EuniqueEssence which had to be about 1988, 1987.

> The Court: Prior to your association with Ms. Benett and the formation of that group, you had not thought of using the word Essence, is that so?
>
> The Witness: No. Prior to that I really was not—no.
>
> Tr. 301

I credit Hutchinson's testimony on the point.

quent bad faith on the part of either party is shown which would have a material effect upon the litigation.

*Quality of Plaintiffs' Product and Sophistication of the Buyers*

These last two factors enumerated in *Polaroid* may be considered together briefly. In a case such as this, where the products are so different, they are of relatively minor importance.

It appears clear enough that plaintiff Hutchinson's performance as a rap singer is of impressive quality. That is best attested to by the enthusiasm with which this completely unknown performer was received by the experienced and sophisticated producers of the movie "New Jack City." Hutchinson has had no opportunity to demonstrate the quality of her performances since, at least in the public eye, because of the deadening effect of ECI's cease and desist letter.

■ "Sophistication of consumers usually militates against a finding of likelihood of confusion." *Centaur* at 1228. Where the products are not identical, sophistication of consumers decreases the likelihood of confusion. *Ibid.*

In the case at bar, ECI asserts with justifiable pride that its readers are sophisticated younger black women.

While there is no direct evidence on the point, it seems fair to assume that the sophistication of consumers of rap music, who are relatively young and of all racial groups, is high in respect of the purchasing choices they make concerning such product. The evidence shows that most new songs vanish into obscurity, while a relative few achieve vast commercial success. That bespeaks criteria of choice on the part of the consuming public, although I would not presume to attempt to define those criteria.

■ The quality of the junior user's product, and the sophistication of the relevant buyers, to the extent instructive in the case at bar, tend to favor plaintiffs Hutchinson and Saddler.

*Other Factors*

The *Polaroid* factors are not exhaustive. In infringement cases the district court sits as a court of equity. As the cases cited hold, the court may have to take other variables into account, including such equitable factors as the harm to the junior user as compared to the benefit the senior user that would result from the requested injunction.

■ That factor must be considered in the case at bar, where a powerful and successful publisher, whose magazine is ostensibly devoted to the betterment of young black women, seeks to deprive a young black woman from using her chosen stage name: an effort which, if successful, the evidence shows would deprive Hutchinson of significant benefits and recognition derived from her use of the stage name ESSENCE at the dawn of her career. In contrast, there is no evidence that Hutchinson's use of the name would cost ECI a single subscriber to its magazine, deprive it of a single page of advertising, interfere in any of the areas of ECI's present licensing activities, or tarnish the reputation of ECI or its mark.

This is not to say that the relative positions of Hutchinson and ECI in the commercial power structure entitle Hutchinson to infringe ECI's trademark with impunity. On the contrary: the trademark laws are intended to prevent a *parvenu* from feeding, by means of the likelihood of confusion, upon the established reputation of a senior user.

It is to say, however, that a court of equity may properly contrast the harm suffered by Hutchinson if she cannot use the stage name ESSENCE with the harm suffered by ECI if she can.

In this context, it is appropriate to note that ECI is an aggressive litigator in protection of its ESSENCE trademark. The district court in *Ithaca* observed:

> Sometime after September, 1982, ECI began an effort to stop the use of the word "essence" on any product even in the fields where it had never been involved. While it appears from its contentions that it is concerned about products aimed

at the black female market, the evidence indicates that efforts are being made to stop the use of the name on products aimed at the entire marketplace. Nor is there necessarily any significant relationship between the products and the magazine.

706 F.Supp. at 1204.

In *Singh* Judge Sweet described the same litigation phenomenon. 703 F.Supp. at 264 n. 2.

Of course, a trademark owner is entitled to engage in aggressive litigation to protect its mark. What a trademark owner is not entitled to do is to pursue a course of action which, if successful, "would be tantamount to awarding it exclusive dominion over a word in common usage," with the consequent "right to impair other parties' possible entrance into areas of endeavor far removed from its own. The trademark laws were not designed to serve this purpose." These are Judge Weinfeld's words in *Information Clearing House, supra,* at 163. Judge Mukasey quoted those words in *Lobo Enterprises, supra,* 693 F.Supp. at 79; and then quoted, as Judge Weinfeld had in *Information Clearing House* an excerpt from the Supreme Court's opinion in *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 50–51, 63 L.Ed. 141 (1918):

> There is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business.
>
> \* \* \* \* \* \*
>
> "The owner of a trade-mark may not, like the proprietor of a patented invention, make a negative and merely prohibitive use of it as a monopoly."

These cautionary notes are applicable to the case at bar.

### Conclusion

ECI, which bore the burden of proof on the issue, has failed to show the requisite likelihood of confusion arising out of Hutchinson's use of the stage name ESSENCE.

Significant equitable considerations favor Hutchinson.

Accordingly plaintiffs are entitled to a declaration of non-infringement. ECI's counterclaim for infringement will be dismissed.

Plaintiffs' claim for money damages will also be dismissed. As counsel for plaintiffs' conceded at oral argument, there is no evidentiary basis for making an award.

While Hutchinson and Saddler have prevailed in this litigation and ECI has lost, I do not find in the case those exceptional circumstances which would justify an award of attorneys' fees in favor of plaintiffs and against ECI. That is so, notwithstanding the fact that I regard ECI's cease and desist letter and later litigation position as inconsistent with the purpose of the trademark laws. ECI's claim of infringement was colorable. Each party will bear its own attorney's fees and costs.

For the foregoing reasons, the Clerk of the Court is directed to enter Judgment as follows:

(1) Declaring that the use by plaintiff Tamara Lisa Hutchinson of the stage name ESSENCE does not infringe any trademark owned by defendant Essence Communications, Inc.; and

(2) Dismissing with prejudice all other claims and counterclaims asserted in the pleadings.

It is SO ORDERED.